UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

PLAZA MOTORS OF BROOKLYN, INC. d/b/a
PLAZA HONDA, PLAZA AUTOMOTIVE, LTD.
d/b/a PLAZA KIA, CRYSTAL BAY IMPORTS LTD.
d/b/a ACURA OF BROOKLYN, PLAZA
OLDSMOBILE, LTD. d/b/a PLAZA TOYOTA,
PLAZA HYUNDAI, LTD, d/b/a PLAZA HYUNDAI,
and CRYSTAL MOTORS OF BAYSIDE, LTD d/b/a
PLAZA AUTO LEASING,

                              Plaintiffs,

                 vs.                                    Case No. 20-cv-04851-WFK-SJB

GOVERNOR ANDREW M. CUOMO, in his
official capacity,

BILL DE BLASIO, Mayor of the City of New York,
In his official capacity, and

EMPIRE STATE DEVELOPMENT
CORPORATION,

                              Defendants.

---

## STATE DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General
State of New York
*Attorney for State Defendants*

28 Liberty Street
New York, New York 10005

MARYAM JAZINI DORCHEH
MATTHEW L. CONRAD

 Assistant Attorneys General
  of Counsel

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND .................................................................................... 3

    A. The COVID-19 Pandemic and the State's Early Response ................................. 3

    B. The Pandemic Is Not Over .............................................................................. 5

THE PRESENT LAWSUIT AND MOTION FOR A PRELIMINARY INJUNCTION ............... 7

STANDARD OF REVIEW ...................................................................................... 8

    A.   Preliminary Injunction Standard of Review for Mandatory Inunctions.......................8

    B.   The Jacobson Standard...........................................................................9

ARGUMENT .................................................................................................... 11

I.  PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS ........................ 11

    A.   EO 202.68 Does Not Violate the Equal Protection Clause............................. 111

       1.   Selective Enforcement ................................................................. 12

       2.   "Class of One" ........................................................................... 14

    B.   EO 202.68 Does Not Discriminate Against Out-of-State Businesses, and Therefore Does Not Implicate the Dormant Commerce Clause ................................................. 16

    C.   EO 202.68 Does Not Violate the Contracts Clause ..................................... 18

       1.   The Contracts Clause is Relevant Only to Existing Contracts ................... 18

       2.   Plaintiffs Cannot Establish a Violation of the Contracts Clause ............... 19

    D.   The Ninth and Tenth Amendments Are Irrelevant to This Case................... 22

II.    PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM ....................................... 23

III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF NEW YORK'S MISSION TO PROTECT ITS CITIZENS FROM A GLOBAL PANDEMIC ....................................................................................... 24

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abrahams v. State of Conn. Dep't of Soc. Servs.*,
  2018 WL 995106 (D. Conn. Feb. 21, 2018) ..........................................................................22

*Agudath Israel of America v. Cuomo*,
  20-CV-4834 (E.D.N.Y.).......................................................................................................9, 25

*Allied Structural Steel Co. v. Spannaus*,
  438 U.S. 234 (1978).......................................................................................................... 18-19

*Ass'n of Jewish Camp Operators v. Cuomo*,
  No. 20 Civ. 687, 2020 WL 3766496 (N.D.N.Y. July 6, 2020).........................................11, 25

*Ass'n of Surrogates & Sup. Ct. Rep'rs v. State of N.Y.*,
  940 F.2d 766 (2d Cir. 1991).....................................................................................................20

*Borey v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania*,
  934 F.2d 30 (2d Cir. 1991).......................................................................................................23

*Buffalo Teachers Fed'n v. Tobe*,
  464 F.3d 362 (2d Cir. 2006).....................................................................................................19

*Carver v. Nassau Cty. Interim Fin. Auth.*,
  2018 WL 1970740 (E.D.N.Y. Apr. 26, 2018) .........................................................................18

*CFCU Cmty. Credit Union v. Hayward*,
  552 F.3d 253 (2d Cir. 2009).....................................................................................................19

*Cranley v. Nat'l Life Ins. Co. of Vt.*,
  318 F.3d 105 (2d Cir. 2003).....................................................................................................11

*D.F. ex rel. Finkle v. Bd. of Educ. Of Syosset Cent. Sch. Dist.*,
  386 F. Supp. 2d 119, 128 (E.D.N.Y. 2005) .............................................................................13

*Elmsford Apartment Assocs., LLC v. Cuomo*,
  --- F. Supp. 3d ---, 2020 WL 3498456 (S.D.N.Y. June 29, 2020).................................... 20-21

*Energy Reserves Group, Inc. v. Kan. Power and Light Co.*,
  459 U.S. 400 (1983)..................................................................................................................19

*Eskenazi-McGibney v. Connetquot Cent. Sch. Dist.*,
  84 F. Supp. 3d 221 (E.D.N.Y. 2015) .......................................................................................14

*Fabri v. United Techs. Int'l, Inc.*,
 387 F.3d 109 (2d Cir. 2004)......................................................................................18

*Fortress Bible Church v. Feiner*,
 694 F.3d 208 (2d Cir. 2012).......................................................................................15

*Freedom Holdings, Inc.*, 357 F.3d 205, 216 (2d Cir. 2005) ................................................ 16-17

*Geller v. Cuomo*,
 2020 WL 4463207 (S.D.N.Y. Aug. 3, 2020).......................................................10-11, 21-22

*Gen. Motors Corp. v. Romein*,
 503 U.S. 181 (1992)...................................................................................................18

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
 481 F.3d 60 (2d Cir. 2007).........................................................................................23

*Harlen Assocs. v. Inc. Village of Mineola*,
 273 F.3d 494 (2d Cir. 2001).......................................................................................12

*Home Bldg. & Loan Ass'n v. Blaisdell*,
 290 U.S. 398 (1934)...................................................................................................19

*Jacobson v. Massachusetts*,
 197 U.S. 11 (1905)............................................................................................ 2, 9-11, 16, 22

*Jenkins v. C.I.R.*,
 483 F.3d 90 (2d Cir. 2007).........................................................................................22

*L&M Bus Corp. v. Bd. of Educ.*,
 2018 WL 2390125 (E.D.N.Y. May 25, 2018) ..................................................................9, 24

*Lebanon Valley Auto Racing Corp. v. Cuomo*,
 No. 20 CV 0804, 2020 WL 4596921 (N.D.N.Y. Aug. 11, 2020)..........................................12

*LeClair v. Saunders*,
 627 F.2d 606 ............................................................................................................13

*Lilakos v. New York City*,
 808 F. App'x 4 (2d Cir. 2020) ....................................................................................12

*Luke's Catering Service, LLC v. Cuomo*,
 No. 20-cv-1086, 2020 WL 5425008 (W.D.N.Y. Sept. 10, 2020)................................. passim

*Maryland v. King*,
 567 U.S. 1301 (2012).................................................................................................24

*McCarthy v. Cuomo*,
 2020 WL 3286530 (E.D.N.Y. June 18, 2020) ................................................................22

*Million Youth March, Inc. v. Safir,*
    155 F.3d 124 (2d Cir. 1998)............................................................................24

*Murphy v. Lamont,*
    2020 WL 4435167 (D. Conn. Aug. 3, 2020) .........................................................17

*Murray v. Cuomo,*
    --- F. Supp. 3d ----, 2020 WL 2521449 (S.D.N.Y. May 18, 2020)........................21

*N.Y.S. Rifle & Pistol Ass'n v. City of N.Y.,*
    86 F. Supp. 3d 249 (S.D.N.Y. 2015), aff'd, 883 F.3d 45 (2d Cir. 2018)...............24

*New Energy Co. of Indiana v. Limbach,*
    486 U.S. 269 (1988)......................................................................................16

*Nken v. Holder,*
    556 U.S. 418 (2009)........................................................................................9

*Oregon Waste Systems, Inc. v. Dep't of Environ. Quality of State of Oregon,*
    511 U.S. 93 (1984).......................................................................................16

*Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Svcs.,*
    769 F.3d 105. (2d Cir. 2014)..........................................................................24

*Padavan v. United States,*
    82 F.3d 23 (1996).........................................................................................22

*Pappas v. Town of Enfield,*
    602 F. App'x 35 (2d Cir. 2015) .................................................................. 14-15

*People ex. rel. Schneiderman v. Actavis PLC,*
    787 F.3d 638 (2d Cir. 2015).............................................................................9

*Pike v. Bruce Church,*
    397 U.S. 137 (1970)................................................................................. 16-17

*Prestopnik v. Whelan,*
    249 F. App'x 210 (2d Cir. 2007) .....................................................................14

*Rini v. Zwin,*
    886 F. Supp. 270 (E.D.N.Y. 1995) ..................................................................22

*Rivera v. FBI,*
    2016 WL 6081435 (N.D.N.Y. Sept. 13, 2016) ....................................................23

*Salinger v. Colting,*
    607 F.3d 68 (2d Cir. 2010)..............................................................................24

iv

*South Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020) .................................................................................... 10-11

*Sullivan v. Nassau Cty. Interim Fin. Auth.*,
    959 F.3d 54 (2d Cir. 2020) .......................................................................... 18, 20-21

*Sveen v. Melin*,
    138 S. Ct. 1815 (2018) ...................................................................................... 20

*Sykes v. N.Y. State Office of Children & Family Svcs.*,
    2019 WL 4688608 (S.D.N.Y. Sept. 25, 2019) .................................................. 11

*The Roman Catholic Diocese of Brooklyn, New York v. Cuomo*,
    20-CV-4844 (E.D.N.Y.), ECF No. 32 ................................................ 9, 13, 15, 25

*United States v. Bifield*,
    702 F.2d 342 (2d Cir. 1983) ............................................................................ 22

*United States v. Salerno*,
    481 U.S. 739 (1987) .......................................................................................... 11

*Varricchio v. Chalecki*,
    2016 WL 5422046 (D. Conn. Sept. 28, 2016), aff'd 701 F. App'x 65 (2d Cir.
    2017) ................................................................................................................ 23

*Vill. of Willowbrook v. Olech*,
    528 U.S. 562 (2000) .......................................................................................... 14

*Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*,
    149 F. Supp. 3d 376 (E.D.N.Y. 2016) .............................................................. 23

*Warren v. U.S.*,
    859 F. Supp. 2d 522 (W.D.N.Y. 2012) ............................................................ 23

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) .......................................................................................... 24

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................ 8, 24-25

*Woodruff v. Rediehs*,
    2018 WL 2175549 (N.D.N.Y. May 11, 2018) .................................................. 22

*Wright v. New York City*,
    2011 WL 4543897 (E.D.N.Y. Sept. 29, 2011) ............................................. 22-23

## CONSTITUTIONS

U.S. Constitution ...................................................................................................... 11

First Amendment ...............................................................................................................25

Ninth Amendment……………………………………………………...............2, 8, 22-23

Tenth Amendment……………………………………………………...2, 8, 22-23

Fourteenth Amendment ...................................................................2, 7, 12, 22

Equal Protection Clause……………………………………………...…2, 7, 8, 11-17

Contract Clause (Art. I, § 10, cl. 1)…………………………………………2, 8, 18-22

Commerce Clause ……………………………………………………….....2,8, 16-17

Dormant Commerce Clause ………………………………………….....................16

New York State Constitution ...............................................................................8

**STATE STATUTES**

N.Y. Exec. Law
    § 29-a ..............................................................................................................4

**STATE REGULATIONS**

EO 202 .................................................................................................................4

EO 202.6 ...........................................................................................................2, 4

EO 202.7 ..............................................................................................................4

EO 202.8 ..............................................................................................................4

EO 202.13 ............................................................................................................4

EO 202.14 ............................................................................................................4

EO 202.18 ............................................................................................................4

EO 202.45 ..........................................................................................................19

EO 202.68 ................................................................................................... passim

### MISCELLANEOUS AUTHORITIES

https://covid19tracker.health.ny.gov/views/NYS-COVID19-
    Tracker/NYSDOHCOVID-19Tracker-
    Fatalities?:embed=yes&:toolbar=no&:tabs=n .................................................................3

https://nyti.ms/3kUJgbs ...................................................................................................3

https://www.governor.ny.gov/news/governor-cuomo-announces-new-cluster
    action-initiative ...............................................................................................................7

https://www.governor.ny.gov/news/governor-cuomo-announces-new-cluster-
    action-initiative#initiativemaps...................................................................................5

New York, Covid Tracking Project, https://covidtracking.com/data/state/new-
    york#historical .................................................................................................................3

The "New York Forward" .................................................................................................4-5

Defendants Andrew M. Cuomo, sued in his official capacity as Governor of the State of New York ("Governor Cuomo"), and the Empire State Development Corporation ("ESD") (collectively, "State Defendants"), respectfully submit this memorandum of law, together with the accompanying Declaration of Commissioner Howard A. Zucker, dated October 20, 2020 ("Zucker Decl."), in opposition to Plaintiffs' motion for a preliminary injunction (ECF No. 1-7).

## PRELIMINARY STATEMENT

The State of New York, along with the rest of the world, continues to confront the greatest public health crisis in living memory. Since the inception of the COVID-19 pandemic, more than 25,000 New Yorkers have succumbed to the virus, and more than half of that number has occurred in New York City alone.  In New York City, the COVID-19 pandemic has caused over 16,000 deaths—an enormous number that could have been far higher had the State not taken urgent and necessary action to halt the spread of the virus by mandating temporary restrictions on businesses and social gatherings. Thanks to these measures, New York was able to flatten the curve for new infections and fatalities and is now working toward lifting restrictions in a measured way, balancing the lives, health, and safety of its citizens with the need to protect their livelihoods. But the danger of a resurgence in cases remains clear and present, which has been demonstrated by the rise of certain cluster areas in the State where there is a spike in infection rates. To combat this worrisome trend in these hot spots, Governor Cuomo issued Executive Order 202.68 ("EO 202.68") to address the surge in positivity witnessed in these hot spots and to stop the rise in cases before they increase exponentially, as happened earlier in the year. These directed and tactical efforts are the best defense to a second wave of the pandemic, and will help avoid broader, more far reaching shutdowns of economic, educational, and social activities throughout New York City and New York State.

Through this lawsuit, Plaintiffs, a group of automobile dealerships in Kings County, would

seek to hamper these efforts by enjoining EO 202.68 as it applies to them. Plaintiffs urge the Court to overlook the rising COVID-19 cases so that they can be allowed to continue unrestricted in-person sales of automobiles, even while these infections are increasing significantly in the areas where Plaintiffs' dealerships are located. Plaintiffs' motion is fatally flawed because it cannot meet *any* of the elements required to obtain such extraordinary preliminary relief.

First, there is no clear or substantial likelihood of success on the merits. *See* Point I, *infra*. Plaintiffs' case fails because EO 202.68 is substantially related to protecting the public health and, therefore, readily survives review under the highly deferential standard for emergency public health measures laid out in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). Even if *Jacobson* did not apply, Plaintiffs could not show a clear likelihood of success on their claims under (i) the Equal Protection Clause of the Fourteenth Amendment; (ii) the Commerce Clause; (iii) the Contracts Clause; and (iv) the Ninth and Tenth Amendments to the United States Constitution, because EO 202.68 is rationally related to the State's critical interest in preventing spikes in COVID-19 cases from spreading and the concomitant threat to public health that this terrible disease presents.  Under such circumstances, even if strict scrutiny applied here (and it does not), the fight against COVID-19 is a governmental interest of the highest order, and EO 202.68 is constitutional because it is narrowly tailored as it focuses on restricting businesses and gatherings in areas where cases are spiking.

Second, Plaintiffs cannot establish irreparable harm, given that EO 202.68 *permits* Plaintiffs to continue operating their businesses with certain restrictions. *See* Point II, *infra*.[1]

Finally, the balance of equities and the public interest tip overwhelmingly in favor of New

---

[1] Plaintiffs admit that under EO 202.68 they may conduct sales remotely and electronically in the Red Zones, with in-person vehicle showing and return and delivery by appointment. Pl. Mem. at 6.  Moreover, their auto repair and maintenance activities are "essential services" permitted under EO 202.68. *See* Zucker Decl., Ex. M (EO 202.6).

York's mission to protect New Yorkers from the imminent dangers presented by COVID-19. *See* Point III, *infra*.

Accordingly, Plaintiffs fail to meet their heightened burden and their motion for a preliminary injunction should be denied.

## FACTUAL BACKGROUND

The ongoing COVID-19 pandemic has caused over 25,000 deaths in New York State, over 16,000 of which were in New York City alone,[2] and hundreds of thousands of deaths worldwide. For much of this spring, New York was the epicenter of the global crisis.[3] Thanks to the lifesaving efforts of medical professionals, essential workers, state and local governments, and ordinary New Yorkers who heeded calls to shelter-in-place and practice social distancing, this State's daily death toll has been reduced from a peak of approximately 800 per day to an average of less than 10 per day.[4] The threat is not over, however, as hundreds of New Yorkers remain hospitalized.[5] Continued vigilance is essential in order to prevent a deadly second wave of the pandemic from afflicting the State and requiring additional extensive shutdowns of schools and businesses. Zucker Decl. ¶ 69.

### A.   The COVID-19 Pandemic and the State's Early Response

COVID-19 is a highly infectious and potentially deadly respiratory disease caused by a newly discovered coronavirus that spreads easily from person-to-person. Zucker Decl. ¶ 10, Ex. B. Because there is no pre-existing immunity against this new virus, it has spread worldwide in an exceptionally short period of time. On January 31, 2020, the World Health Organization ("WHO") declared a "public health emergency of international concern." Zucker Decl. ¶ 11, Ex. C. Less than

---

[2] Fatalities, New York State Department of Health ("DOH"), https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?:embed=yes&:toolbar=no&:tabs=n.
[3] *See* https://nyti.ms/3kUJgbs.
[4] *See* New York, COVID Tracking Project, https://covidtracking.com/data/state/new-york#historical.
[5] *See id*.

two months later, on March 11, 2020, WHO characterized the COVID-19 outbreak as a pandemic. Zucker Decl. ¶ 13, Ex. D. On March 7, 2020, pursuant to N.Y. Exec. Law § 29-a, Governor Cuomo issued Executive Order ("EO") 202, implementing the State Comprehensive Emergency Management Plan and declaring a statewide disaster emergency. Zucker Decl. ¶ 22. By EO 202, the Governor suspended all state and local laws, rules, and regulations to the extent necessary to address the COVID-19 emergency. *Id.* Following the issuance of EO 202, Governor Cuomo issued multiple supplemental EOs, continuing the temporary suspension and modification of certain laws relating to the state of emergency. Zucker Decl. ¶¶ 30-7.

For example, on March 18, 2020, Governor Cuomo issued EO 202.6, which mandated remote working procedures, where possible, and reduced onsite workforce by 50 percent for non-essential businesses. Zucker Decl. ¶¶ 31-2, Ex. M. EO 202.6 also created exceptions for the in-person work restrictions for essential businesses. *Id.* On March 19, 2020, Governor Cuomo issued EO 202.7, which, among other directives, required non-essential employers to reduce the in-person workforce by 75 percent no later than March 21, 2020. Zucker Decl. ¶ 33, Ex. N. On March 20, 2020, Governor Cuomo issued EO 202.8, which among directives, mandated the reduction of onsite workforce for non-essential businesses by 100 percent no later than March 22, 2020. Zucker Decl. ¶ 34, Ex. O. On March 30, 2020, Governor Cuomo issued EO 202.13, which directed non-essential construction businesses to comply with the in-person workforce reduction. The workforce closures were extended through April 29, 2020 pursuant to EO 202.14, then to May 15, 2020 pursuant to EO 202.18 and then to May 28, 2020 pursuant to 202.31. Zucker Decl. ¶ 37, Ex. P.

Over the course of May and June, as the State's infection and death rates began to stabilize and then decline, New York transitioned from the "New York on PAUSE" initiative to the "New

York Forward" initiative, a phased plan to guide the reopening of non-essential businesses. Zucker Decl. ¶ 39. The "New York Forward" initiative was intended to begin a phased reopening of New York's economy in a targeted, measured way that would prevent any new spikes in COVID-19 cases. Zucker Decl. ¶ 40. Through this carefully calibrated reopening plan, which has been data-driven and guided by public health experts, the State was able to keep the number of new infections and deaths relatively flat at a time when cases were spiking throughout the rest of the nation. *Id.*

### B.    The Pandemic Is Not Over

Since early September 2020, the New York State Department of Health ("DOH") has observed clusters spike in a number of areas, including a large area in Brooklyn and smaller areas in Queens, Broome, Orange and Rockland Counties. Zucker Decl. ¶ 48. Responding to this new surge, on October 6, 2020, Governor Cuomo announced a new Cluster Action Initiative ("Initiative") to address COVID-19 hot spots that have cropped up.[6] Zucker Decl. ¶ 53, Ex. Q. As part of that Initiative, Governor Cuomo issued EO 202.68, which went into effect on October 9, 2020 and is effective through November 5, 2020. Zucker Decl., Ex. T. EO 202.68 directs DOH to determine areas in the State that require enhanced public health restrictions based upon COVID-19 positive cases at levels that compromise the State's containment of the virus. *Id.* EO 202.68 addresses these hot spots by creating three zones based upon the severity of the cluster activity. *Id.* An area may be placed in a "Red Zone" if the following factors are met:

- The area is a defined geographic area (which may or may not align to geopolitical or other common geographic subdivisions, such as county, zip codes, or contiguous neighborhoods) has a 7-day rolling average positivity rate of 3% or higher for a sustained period of time (metrics adjusted for population size and population density);
- Positive cases reflect community spread and cannot be solely explained by a contained cluster in a single institution (e.g., nursing home, factory, college, etc.); and
- DOH, in consultation with the local departments of health, finds that it is in the best interest of public health for the area to be placed in Red Zone status.

---

[6] https://www.governor.ny.gov/news/governor-cuomo-announces-new-cluster-action-initiative#initiativemaps.

Zucker Decl. ¶ 45. Once an area has been designated as a "Red Zone," "The State DOH in coordination with local health authorities will use case incidence and mapping data to refine boundaries that balance epidemiological priorities with geographic realities." Zucker Decl. ¶ 47.

In the Red Zones, DOH has adopted mitigation measures that, in essence, postpone all non-essential gatherings and close schools and non-essential businesses:

- "Non-essential gatherings of any size shall be postponed or cancelled";
- "All non-essential businesses, as determined by [ESD] based upon published guidance, shall reduce in-person workforce by 100%";
- "[A]ny restaurant or tavern shall cease serving patrons food or beverages on-premises and may be open for takeout or delivery only"; and
- "[T]he local Department of Health shall direct closure of all schools for in-person instruction, except as otherwise provided in Executive Order." Zucker Decl. ¶ 63.

DOH adopts successively less restrictions in "Orange Zone"- warning zone and "Yellow Zone"- precautionary zone. Zucker Decl. ¶ 55.

The map of the zones is drawn from data submitted to the State's Electronic Clinical Laboratory Reporting System ("ECLRS") based on areas of concern determined by looking at positivity rates. Zucker Decl. ¶¶ 76-8. The positive cases are represented as dots on a map and indicate areas with high positivity percentages. Zucker Decl. ¶ 79. A COVID-19 Task Force (the "Task Force") within DOH first looks at the zip codes with the highest positivity rates and then breaks that down further based on individual addresses using the data pulled from ECLRS. Zucker Decl. ¶¶ 80-1. A Red Zone contains the highest level and concentration of positive cases, which is the cluster itself and is created by analyzing the mapping of the positivity rates and using streets as boundaries. Zucker Decl. ¶ 80. For example, in the Brooklyn Red Zone where the car dealerships are located, the positivity rate was 7.67% the week of September 20 through September 26, 2020, 6.69% the week of September 27 through October 3, 2020, and 5.86% during the week of October 4 through October 10, 2020. Zucker Decl. ¶ 49. During those same

time periods, the Statewide percent positivity rate, excluding Red Zones, was 0.97%, 1.25%, and 1.18%, respectively. Zucker Decl. ¶ 49. These spikes necessitated immediate attention to contain the virus and mitigate the spread throughout the community. Zucker Decl. ¶ 49. Furthermore, the positivity rates in the combined Red Zones as of October 17, 2020 is 3.19% – a gradual reduction from the 7.9% positivity rate during the week of September 20 through September 26. While this indicates that the targeted restrictions are having the desired effect to mitigate and control the spread of the virus, this is still approximately three times greater than the approximate overall State positivity rate, which is still highly concerning since it is above 1%. Zucker Decl. ¶ 82.

As Governor Cuomo explained at the October 8, 2020 press conference discussing the Initiative, "working with the top public health experts, New York State developed a science-based approach to attack these clusters and stop any further spread of the virus, including new rules and restrictions directly targeted to areas with the highest concentration of COVID cases and the surrounding communities."[7] EO 202.68 effectively mitigates infection by focusing on containing the spread of the virus in areas that have shown a peak in the rate of positive tests before it threatens the State's containment of the virus. Zucker Decl. ¶¶ 49, 54, 74, 84.

**THE PRESENT LAWSUIT AND MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiffs are automobile dealerships located in an area in Kings County designated as a Red Zone due to its high rate of positive COVID tests. ECF No. 1, Amended Complaint ("Am. Compl.") ¶ 7. Plaintiffs commenced this action by filing a complaint, on or about October 8, 2020, which they amended on October 16, 2020, challenging EO 202.68 as violating the (1) Equal Protection Clause under the Fourteenth Amendment based on selective enforcement and as a class

---

[7] *See* https://www.governor.ny.gov/news/governor-cuomo-announces-new-cluster-action-initiative.

of one; (2) the Commerce Clause; (3) the Contracts Clause; (4) the Ninth and Tenth Amendments; and (4) equal protection under the New York State Constitution.[8] *See id.* Plaintiffs claim that EO 202.68 must be struck down as arbitrary, capricious, and an abuse of discretion because "[t]here is no rational basis to conclude that Plaintiffs' dealerships, which are in the 'red zone,' are more at risk of proliferating the spread of COVID-19 other than other dealerships outside the 'red zone' such that Plaintiffs must be forced to shut down, permanently lose their employees to other dealerships just mere blocks away outside of the 'red zone.'" Memorandum of Law in Support of Plaintiffs' Application for a Temporary Restraining Order and Preliminary Injunction ("Pl Mem."), ECF No. 5, at 1-2.

Plaintiffs filed their motion for a temporary restraining order ("TRO") and preliminary injunction on October 8, 2020, requesting that the Court enjoin Governor Cuomo from enforcing EO 202.68 to the extent it restricts their *in-person sales*. ECF No. 4-7, *see supra* n. 1. This Court denied the temporary restraining order and ordered a preliminary injunction hearing on October 22, 2020 at 2 pm. ECF No. 13.

## STANDARD OF REVIW

### A.    Preliminary Injunction Standard of Review for Mandatory Injunctions

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs bear the burden of showing that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) that an

---

[8] While in the introduction to their motion Plaintiffs off-handedly refer to substantive and procedural due process, they make no argument regarding this point, and apparently did not intend to base their motion on this. *Compare* Complaint (ECF No. 1), ¶ 35 (alleging violations of substantive and procedural due process) *with* Amended Complaint (ECF No. 17), ¶ 35 (removing these allegations).

injunction is in the public interest. *Id*. at 20. The final two factors – the balance of the equities and the public interest – "'merge when the Government is the opposing party.'" *L&M Bus Corp. v. Bd. of Educ.*, 2018 WL 2390125, at *13 (E.D.N.Y. May 25, 2018) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). A movant is held "to a heightened standard" where, as here, an injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial." *People ex. rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015). Such cases, referred to as mandatory injunctions, are the most difficult to obtain and "the movant must show a clear or substantial likelihood of success on the merits and make a strong showing of irreparable harm, in addition to showing that the preliminary injunction is in the public interest." *Id.* (quotation marks omitted).

Here, Plaintiffs seek an injunction that would provide them "with substantially all the relief sought" and could not be "undone." Indeed, if they resume unrestricted *in-person sales*, then any resulting spread of illness, and potential deaths, certainly could not be undone. For this reason, in *Agudath Israel of America v. Cuomo*, 20-CV-4834 (E.D.N.Y.), in which Orthodox Jewish organizations and Rabbis sought to enjoin the same Executive Order at issue here, Judge Matsumoto applied this heightened standard and found plaintiffs unable to meet any of the elements necessary for preliminary relief. *See Agudath Israel of America*, 20-CV-4834, ECF No. 14 ("*Agudath* Tr.") at 45:5-18. And even more recently, this Court denied similar relief in *The Roman Catholic Diocese of Brooklyn, New York v. Cuomo* ("*Catholic Diocese*"), 20-CV-4844 (E.D.N.Y.), ECF No. 32 (denying plaintiff's motion for a preliminary injunction against EO 202.68 because, *inter alia*, "the injunction would not be in the public interest"). Here too, Plaintiffs' preliminary injunction motion must be denied.

**B.    The *Jacobson* Standard**

The question of whether the EO 202.68 violates Plaintiffs' constitutional rights must be viewed through the lens of the State's overriding interest in protecting the people of New York from the ongoing pandemic and in deference to the difficult and time-sensitive choices that the State must make in doing so. In evaluating such efforts, the Court should be guided by *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), the seminal case on the government's ability to protect its citizens from critical public health concerns. *Jacobson* upheld a mandatory vaccination statute to protect against smallpox, holding that "'a community has the right to protect itself against an epidemic of disease which threatens its members,' and that in such times judicial review is reserved for a measure that 'has no real or substantial relation' to the object of public health or is 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" *Geller v. Cuomo*, 2020 WL 4463207, at *10 (S.D.N.Y. Aug. 3, 2020) (upholding New York's prohibition of non-essential public gatherings of over 50 people) (quoting *Jacobson*, 197 U.S. at 10).

In *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020), Chief Justice Roberts emphasized the salience of *Jacobson* to state governments' responses to the COVID-19 public health crisis. Concurring in the Court's denial of plaintiffs' application for preliminary injunctive relief, Chief Justice Roberts stated as follows:

> The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts [t]he safety and the health of the people to the politically accountable officials of the States to guard and protect. When those officials undertake[] to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad.

*Id.* at *2-*3 (denying injunctive relief against order aimed at limiting spread of COVID-19) (internal citations omitted); *see also Geller*, 2020 WL 4463207, at *10 (S.D.N.Y. Aug. 3, 2020) ("Under these circumstances, the Chief Justice's words in *South Bay Pentecostal Church v.*

10

*Newsom*, seem particularly fitting: public officials responding to a public health crisis must be afforded especially broad latitude, such that they should not be open to 'second-guessing' by an 'unelected federal judiciary which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Geller*, 2020 WL 4463207, at *10 (citing *South Bay Pentecostal Church*, 140 S.Ct. at 1613-14); *Ass'n of Jewish Camp Operators v. Cuomo*, No. 20 Civ. 687, 2020 WL 3766496, at *8 (N.D.N.Y. July 6, 2020) ("the Court joins the many courts throughout the country that rely on *Jacobson* when determining if a governor's executive order has improperly curtailed an individual's constitutional right during the COVID-19 pandemic"); *Luke's Catering Service, LLC v. Cuomo*, No. 20-cv-1086, 2020 WL 5425008, at * 15 (W.D.N.Y. Sept. 10, 2020) (applying *Jacobson* in denying a preliminary injunction in a challenge to New York's 50-person limit on event and banquet venues).

## ARGUMENT

## I.   PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs fail to demonstrate that they have any likelihood of succeeding on the merits of their claims, much less a likelihood that is "clear or substantial," on any of their legal theories.[9]

### A.   EO 202.68 Does Not Violate the Equal Protection Clause

Plaintiffs claim that EO 202.68 violates their Equal Protection rights under the U.S. Constitution, under both selective enforcement and "class of one" theories. Neither claim can succeed.

---

[9] It is unclear whether Plaintiffs ask that EO 202.68 be struck down facially, or only as applied to them. To the extent that Plaintiffs bring a facial challenge, they "face[ ] an uphill battle because it is difficult to demonstrate that mere enactment of a piece of legislation violates the plaintiff's constitutional rights." *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 110 (2d Cir. 2003) (citation omitted). A facial challenge "is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987). This "remains the basis for evaluating facial constitutional challenges in the Second Circuit." *Sykes v. N.Y. State Office of Children & Family Svcs.*, 2019 WL 4688608, at *14, n.14 (S.D.N.Y. Sept. 25, 2019).

11

### 1.   Selective Enforcement

Plaintiffs' first argument that the Executive Order establishing Red Zones and placing them in that zone constitutes selective enforcement against them fails on its face. "To prevail on a claim of selective enforcement, plaintiffs in this Circuit traditionally have been required to show both (1) that they were treated differently from other similarly situated individuals, *and* (2) that such differential treatment was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *See Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). "The similarly situated individuals must be "roughly equivalent."" *Lebanon Valley Auto Racing Corp. v. Cuomo*, No. 20 CV 0804, 2020 WL 4596921, at *5-6 (N.D.N.Y. Aug. 11, 2020) (internal citation omitted) (dismissing equal protection claims where plaintiffs did not plausibly plead facts suggesting that they have been treated differently from others similarly situated).

Here, Plaintiffs do not satisfy either prong of the selective enforcement analysis. First, they do not allege that they are being treated differently from any similarly situated car dealership – that is, another dealership located within the Red Zone, which has elevated risk due to spiking COVID-19 cases. Plaintiffs point to dealerships outside the Red Zones as their comparators, but for the purpose of this analysis, dealerships located in areas at lower risk for community spread of COVID-19 are not comparable. *See Lilakos v. New York City*, 808 F. App'x 4, 8 (2d Cir. 2020) (dismissing equal protection claim for failure to allege specific facts showing that the comparators are "similar in relevant respects"); *see also Lebanon Valley Auto Racing Corp.*, 2020 WL 4596921, at 5-6 ("Plaintiffs vague references to 'demonstrators' and 'rioters,' . . . do not convince the Court that such individuals are "roughly equivalent' to state-regulated businesses such as racetracks."). Here, the boundaries of the Red Zone were determined by considering the 7-day rolling average

12

positivity rate, adjusted for population size and density, without singling out specific types of businesses or institutions. Zucker Decl. ¶¶ 56, 81. Plaintiffs are located in a geographical area that, as determined by the State's public health officials, is surging in COVID-19 cases. Regardless of Plaintiffs' own purported COVID-19 infection rates, being located in an area with a high risk of potential community spread requires some form of mitigation of contact for businesses within the hotspot to prevent further spread. Zucker Decl. ¶ 71. As noted by the court in *Catholic Diocese*: "Although churches instruct parishioners not to attend services if they are sick, they do not require a negative COVID-19 test result for entry, and therefore must rely on parishioners to self-police. 20-CV-4844 at 22. This is particularly problematic because it is well established that asymptomatic people—who would have no reason under the Church's own protocols to stay away—can spread COVID-19." As businesses outside the Red Zone are less likely to contribute to community spread due to lower positivity rates in those areas, the appropriate comparators to Plaintiffs are other dealerships within the Red Zone, which are subject to identical restrictions. Plaintiffs have not alleged—nor could they allege—that they are treated differently from other Red Zone dealerships, and therefore, their claim fails on this basis alone.

Second, Plaintiffs' selective enforcement claim also fails because they cannot show that the alleged selective treatment was "based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders*, 627 F.2d 606, 609-10. Plaintiffs' conclusory claim that "Defendants have evinced an intent to discriminate on the basis of impermissible considerations" (Pl. Mem. at 17) is insufficient to make that showing. *See D.F. ex rel. Finkle v. Bd. of Educ. Of Syosset Cent. Sch. Dist.*, 386 F. Supp. 2d 119, 128 (E.D.N.Y. 2005), *aff'd sub nom.* 180 F. App'x 232 (2d Cir. 2006) ("Plaintiff's allegations of selective treatment are wholly conclusory and such

13

conclusory allegations of selective treatment are insufficient to defeat a motion to dismiss."). Indeed, Plaintiffs allege no facts remotely suggesting that State Defendants had any intent to "inhibit or punish the exercise" of Plaintiffs' constitutional rights, or had any "malicious or bad faith intent to injure" them – a necessary element to a selective enforcement claim where the Plaintiffs are not part of a protected class. Plaintiffs are also unable to advance a credible claim that the State Defendants sought to harm a specific car dealership for no discernible purpose. In the absence of this mandatory showing, Plaintiffs' selective enforcement claim fails as a matter of law.

### 2. "Class of One"

Plaintiffs' "class of one" Equal Protection claim similarly fails. In a "class of one" claim, "the plaintiff uses 'the existence of persons in similar circumstances who received more favorable treatment than the plaintiff . . . to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain.'" *Eskenazi-McGibney v. Connetquot Cent. Sch. Dist.*, 84 F. Supp. 3d 221, 236 (E.D.N.Y. 2015) (quoting *Prestopnik v. Whelan*, 249 F. App'x 210, 212–13 (2d Cir. 2007)). "A successful claim requires an extremely high degree of similarity between the plaintiff and her comparators." *Pappas v. Town of Enfield*, 602 F. App'x 35, 36 (2d Cir. 2015) (internal quotations omitted).

To prevail on an equal protection class-of-one claim, a plaintiff must show that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *Pappas*, 602 F. App'x at 36 (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Plaintiffs must also establish that "(i) no rational person could regard the circumstances of the plaintiff[s] to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the

14

similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Pappas*, 602 F. App'x at 36 (citing *Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012)).

Plaintiffs have failed to satisfy these tests. First, as with their selective enforcement claim, Plaintiffs are unable to show comparators with an "extremely high degree of similarity" to themselves. As discussed *supra*, the competing dealers with whom Plaintiffs compare themselves are in lower risk areas for COVID-19 community spread. The State Defendants clearly have a rational basis to distinguish between businesses located within a Red Zone to those outside of it. Here, State Defendants relied on scientific data, global experts, and DOH's expertise in considering rolling average positivity rates mapped to individual streets, with appropriate adjustments based on demographic data such as population density. Zucker Decl. ¶¶ 56, 61; *see Luke's Catering Serv., LLC,* 2020 WL 5425008, at *10 (denying Plaintiffs preliminary injunction on equal protection grounds because "Defendant's 50-person limitation on large gatherings is based on expert scientific and medical advice and is directly related to protecting the citizenry against the mass transmission of COVID-19.").

Even if dealerships outside the Red Zone were appropriate comparators, Plaintiffs have made no assertion that they were *intentionally* singled out and treated differently from others, and if, hypothetically, the State Defendants did so, that there is no rational basis for such differential treatment. *See Pappas*, 602 F. App'x at 36. The basis for the difference is quite clear – the State Defendants' reliance on epidemiological data on local positivity rates, which show the increased risk of community spread in "hot spot" areas. Zucker Decl. ¶¶ 51, 52, 66; *See Catholic Diocese* at 21 ("The evidence submitted by the state corroborates that the purpose of EO 202.68 is to intervene and enforce heightened protocols in certain geographic areas experiencing disturbing new

outbreaks in order to keep the outbreaks from spreading."). In light of the broad discretion afforded to state officials in dealing with a public health crisis by *Jacobson*, this is more than sufficient to withstand constitutional scrutiny.

### B.     EO 202.68 Does Not Discriminate Against Out-of-State Businesses, and Therefore Does Not Implicate the Dormant Commerce Clause

Plaintiffs contention, that EO 202.68 violates the Dormant Commerce Clause, is facially meritless, as the State Defendants are regulating businesses solely within the State and plainly are not discriminating against interstate commerce.

The Commerce Clause "not only grants Congress the authority to regulate commerce among the States, but also directly limits the power of the States to discriminate against interstate commerce. This 'negative' aspect of the Commerce Clause prohibits economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 273 (1988) (internal citations omitted). Thus, it restricts a state from disadvantaging *out of state* businesses in favor of its own. *Oregon Waste Systems, Inc. v. Dep't of Environ. Quality of State of Oregon*, 511 U.S. 93, 99 (1984) (prohibiting "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter").

Courts have identified several ways through which a state statute may violate the Dormant Commerce Clause. "First, a statute that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid per se, and can survive only if the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism. Second, if the statute does not discriminate against interstate commerce, it will nevertheless be invalidated under the *Pike* balancing test if it imposes a burden on interstate commerce incommensurate with the local benefits secured." *Freedom Holdings, Inc.*, 357 F.3d 205, 216 (2d Cir. 2005) (internal citations

16

omitted). "Under the *Pike* balancing test, [a party] must show that a statute enacted for a legitimate public purpose, although apparently evenhanded, actually imposes burdens on interstate commerce that exceed the burdens on intrastate commerce, and that those excess burdens on interstate commerce are "clearly excessive in relation to the putative local benefits." *Id.* at 217 (citing *Pike v. Bruce Church*, 397 U.S. 137 (1970)) (other internal citations omitted). "The statute, at a minimum, must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce. Under the *Pike* test, if no such unequal burden be shown, a reviewing court need not proceed further." *Id.* at 217-18; *see also Murphy v. Lamont*, 2020 WL 4435167, at *15 (D. Conn. Aug. 3, 2020).

Here, EO 202.68 cannot be reasonably said to constitute any form of economic protectionism by New York against out-of-state businesses. The "clear discrimination" prong of this test is plainly inapplicable, because EO 202.68 does not in any way distinguish between out-of-state and in-state dealerships, but only between dealerships located *within* New York State, based on relevant public health metrics. The *Pike* balancing test simply does not support Plaintiffs' claim, because EO 202.68 does not "impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." *Freedom Holdings*, 357 F.3d at 217-18; *see also Murphy*, 2020 WL 4435167, at *15 (rejecting Commerce Clause challenge to executive orders targeting COVID-19 spread where none "provide for 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter'").

Plaintiffs have not come close to demonstrating a disparate burden on interstate commerce due to a temporary and partial restriction on in-person sales at auto dealerships located in Red Zones, such as plaintiffs, especially since EO 202.68 applies equally to in-state and out-of-state customers. They have also failed to meet their burden to show that the relief sought outweighs the

local benefit of forestalling a second wave of a deadly pandemic that has killed tens of thousands of New Yorkers. *See id.* (burden on interstate commerce imposed by Connecticut's COVID-19 executive orders outweighed by the benefit to Connecticut residents).

### C. EO 202.68 Does Not Violate the Contracts Clause

Plaintiffs allege that EO 202.68 violates the Contracts Clause (U.S. Const., art. I, § 10, cl. 1.). As an initial matter, however, Plaintiffs misunderstand this constitutional provision. The Contracts Clause protects *existing* contractual obligations from unreasonable government interference; it has no applicability to government action that might potentially prevent a contract from being made in the first place, which is contrary to Plaintiffs' assertions. In any event, EO 202.68 would easily satisfy the test for permissible government impositions on pre-existing contractual rights.

#### 1. The Contracts Clause is Relevant Only to *Existing* Contracts

As a threshold matter, the Contracts Clause only restricts the State from, in some instances, impairing obligations under *existing* contracts. *See, e.g., Gen. Motors Corp. v. Romein*, 503 U.S. 181, 182 (1992) ("[C]hanges in the laws that make a contract legally enforceable may trigger Contract Clause scrutiny if they impair the obligation of pre-existing contracts[.]"); *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978) (the Contracts Clause "must be understood to impose some limits upon the power of a State to abridge existing contractual relationships"); *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 124 (2d Cir. 2004) (same); *Carver v. Nassau Cty. Interim Fin. Auth.*, 2018 WL 1970740, at *6 (E.D.N.Y. Apr. 26, 2018), aff'd sub nom. *Sullivan v. Nassau Cty. Interim Fin. Auth.*, 959 F.3d 54 (2d Cir. 2020) ("It is clear, however, that the contracts clause prohibits the impairment by the state of *existing* contracts but does not apply to contracts created after the allegedly-offensive law was enacted.") (emphasis in original, internal quotations omitted).

18

Plaintiffs claim that "EO 202.68 impairs the ability of Plaintiffs to *enter into* contracts with customers in order to purchase or lease vehicles[.]" Pl. Memo at p. 19 (emphasis added). This allegation falls woefully short of stating a plausible Contracts Clause claim.  Plaintiffs have not pointed to any specific contract and have not claimed any impairment of *existing* contracts. Consequently, the Contracts Clause is entirely inapplicable here.

### 2.   Plaintiffs Cannot Establish a Violation of the Contracts Clause

Even if Plaintiffs had adequately alleged that EO 202.68 interfered with their existing contracts, which they have not, they still have not identified a plausible constitutional violation. The Contracts Clause provides that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]" U.S. Const., art. I, § 10, cl. 1. However, "[a]lthough the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *CFCU Cmty. Credit Union v. Hayward*, 552 F.3d 253, 266 (2d Cir. 2009) (citing *Energy Reserves Group, Inc. v. Kan. Power and Light Co.*, 459 U.S. 400, 410 (1983)).

The Contracts Clause "does not trump the police power of a state to protect the general welfare of its citizens, a power which is 'paramount to any rights under contracts between individuals.'" *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 367-68 (2d Cir. 2006) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978)). "Rather, courts must accommodate the Contract Clause with the inherent police power of the state 'to safeguard the vital interests of its people.'" *Id.* (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934)); *see Luke's Catering Serv., LLC.*, 2020 WL 5425008, at *12 (the "temporary and proper exercise of the police power to protect the health and safety of the community [as was done by the 50-person limit in place by EO 202.45] . . . weighs against a taking."). "Thus, state laws that impair an obligation under a contract do not necessarily give rise to a viable Contracts Clause claim[.]" *Id.* Moreover,

"in reviewing economic and social regulation" under the Contracts Clause, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Ass'n of Surrogates & Sup. Ct. Rep'rs v. State of N.Y.*, 940 F.2d 766, 771 (2d Cir. 1991) (citations omitted).

To determine whether a government directive violates the Contracts Clause, Second Circuit courts have considered "(1) whether the contractual impairment is substantial and, if so, (2) whether the law serves a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) whether the means chosen to accomplish this purpose [are] reasonable and necessary." *Sullivan v. Nassau Cty. Interim Fin. Auth.*, 959 F.3d 54, 64 (2d Cir. 2020); *see also Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018).

Here, Plaintiffs cannot succeed on establishing any of these factors. First, they simply cannot allege that there has been an impairment of any pre-existing contract, much less a "substantial" one. "The substantiality of an impairment depends upon the extent to which reasonable expectations under the contract have been disrupted." *Sullivan*, 959 F.3d at 64; *see also Sveen*, 138 S.Ct. at 1822 ("In answering that question, the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights."). A contract that does not yet exist clearly carries no "reasonable expectations."

Under this standard, Plaintiffs cannot credibly assert that EO 202.68 caused a "substantial" disruption to their business since they may continue to conduct sales remotely and electronically and are not prohibited from entering into contracts for the sale and lease of vehicles. And, critically, the restrictions are *temporary*, a fact that weighs heavily against finding that they have lost the benefit of any (theoretical) contract. *See Elmsford Apartment Assocs., LLC v. Cuomo*, --- F. Supp. 3d ---, 2020 WL 3498456, at *15 (S.D.N.Y. June 29, 2020) (statewide eviction moratorium

20

imposed by Executive Order 202.28 does not violate the Contracts Clause because it "does not eliminate the suite of contractual remedies available to the Plaintiffs; it merely postpones the date on which landlords may commence summary proceedings against their tenants").

Where, as here, a Contracts Clause claim does not adequately allege a "substantial" impairment of pre-existing contract rights, it is unnecessary to consider the remaining factors. *See, e.g., Elmsford*, 2020 WL 3498456, at *12. Regardless, Plaintiffs also fail under the second factor, because EO 202.68 clearly serves not merely a "legitimate public purpose such as remedying a general social or economic problem," *Sullivan*, 959 F.3d at 64, but an extraordinarily compelling one. EO 202.68 is part of an effort to prevent a second COVID-19 pandemic wave from striking New York, and to potentially save tens of thousands of lives, by isolating clusters of cases and preventing community spread. *See, e.g., Luke's Catering Serv., LLC*, 2020 WL 5425008, at *13 (collecting cases identifying the mitigation of the COVID-19 pandemic as a substantial government interest); *Geller*, 2020 WL 4463207, at *11 (declining to enjoin New York State's restrictions on public gatherings because preventing COVID-19 spread is "a substantial government interest"); *Murray v. Cuomo*, --- F. Supp. 3d ----, 2020 WL 2521449, at *11 (S.D.N.Y. May 18, 2020) ("Controlling the spread of the disease in order to contain the [COVID-19] pandemic, minimize deaths, allocate scare hospital resources, and prevent a larger public health catastrophe (with its attendant other negative impacts on society) is a powerful compelling government interest.").

Finally, the means chosen to address this compelling purpose are reasonable and necessary. EO 202.68 imposes business restrictions on a narrowly drawn geographical area based on the actual number of COVID-19 cases detected within that area, and only for a short period of time before reevaluation of the necessity and extent of the restrictions. It is far more narrowly tailored

than other restrictions that have survived constitutional scrutiny. *See, e.g., Geller*, 2020 WL 4463207, at * 14 (declining to enjoin restrictions on public gatherings); *McCarthy v. Cuomo*, 2020 WL 3286530, at *3 (E.D.N.Y. June 18, 2020) (declining to enjoin statewide business closures). Particularly in view of the wide latitude afforded to state officials by *Jacobson* to address a pandemic, the Court should not substitute its own judgment for the measures determined by the State Defendants to be reasonable and necessary to protect the people of New York.

> **D.      The Ninth and Tenth Amendments Are Irrelevant to This Case**

Plaintiffs allege in perfunctory fashion that EO 202.68 violates their rights under the Constitution's Ninth and Tenth Amendments. These claims are meritless, if not frivolous.

"The Ninth Amendment is not an independent source of individual rights; rather, it provides a 'rule of construction' that [courts] apply in certain cases." *Jenkins v. C.I.R.*, 483 F.3d 90, 92 (2d Cir. 2007) (citing *United States v. Bifield*, 702 F.2d 342, 349 (2d Cir. 1983)); *Rini v. Zwin*, 886 F. Supp. 270, 289-90 (E.D.N.Y. 1995) (collecting cases). There is no private right of action available under the Ninth Amendment. *Wright v. New York City*, 2011 WL 4543897, at *3 (E.D.N.Y. Sept. 29, 2011). Moreover, the Ninth Amendment has not been interpreted to be incorporated into the due process clause of the Fourteenth Amendment, and thus has no applicability to claims against non-federal actors. *Abrahams v. State of Conn. Dep't of Soc. Servs.*, 2018 WL 995106, at *10 (D. Conn. Feb. 21, 2018).

The Tenth Amendment "was adopted for the specific purpose of preserving federalism and state sovereignty." *Woodruff v. Rediehs*, 2018 WL 2175549, at *3 (N.D.N.Y. May 11, 2018); *Padavan v. United States*, 82 F.3d 23, 29 (1996) ("The purpose of the Tenth Amendment is to limit Congress from usurping power that was reserved to the states."). "[T]here is nothing in the history of its adoption to suggest that it was more than declaratory of the relationship between the national and state governments[.]" *Woodruff*, 2018 WL 2175549, at *3. Indeed, it does not protect

22

any specific personal right. *Varricchio v. Chalecki*, 2016 WL 5422046, at *8 (D. Conn. Sept. 28, 2016), *aff'd* 701 F. App'x 65 (2d Cir. 2017). Only the Federal government, by asserting a power not surrendered by the States of the people, can be alleged to have violated the Tenth Amendment. *Warren v. U.S.*, 859 F. Supp. 2d 522, 543 (W.D.N.Y. 2012). Because Plaintiffs do not bring suit against federal officials, they fail to allege a Tenth Amendment claim. In any event, there is no private right of action for enforcing the Tenth Amendment. *Rivera v. FBI*, 2016 WL 6081435, at *1 n.4 (N.D.N.Y. Sept. 13, 2016); *Wright*, 2011 WL 4543897, at *3. Therefore, Plaintiffs have no standing under the Ninth or Tenth Amendments.

## II.    PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM

Plaintiffs have failed to show that the temporary measures implemented by the State Defendants to combat the COVID-19 pandemic will cause them irreparable harm. *Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*, 149 F. Supp. 3d 376, 390 (E.D.N.Y. 2016) (plaintiffs must show "they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.") (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)).

EO 202.68 allows Plaintiffs to continue remote and electronic sales, car showings, and delivery by appointment, as well as the service and maintenance aspects of their businesses. Their claimed harm caused by a temporary restriction on in-person sales amounts to no more than financial harm. *See Borey v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 934 F.2d 30, (2d Cir. 1991) ("Monetary loss alone will generally not amount to irreparable harm. A monetary loss will not suffice unless the movant provides evidence of damage that cannot be rectified by financial compensation."); *see also Luke's Catering Serv., LLC*, 2020 WL 5425008, at *13 ("[W]hile the economic impact of the 50-person limitation undoubtedly hits hard, the Executive Orders are temporary; Plaintiffs are permitted to continue business operations within

the confines of the Executive Orders; and no documentary evidence has been submitted to support Plaintiff's claims of near insolvency.").

On the other hand, the State suffers irreparable harm any time that it is enjoined from enforcing its policies. *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers). In the present case, such harm is manifest because the policy Plaintiffs challenge is intended to halt neighborhood spikes in COVID-19 cases and prevent deadly infections from increasing exponentially and spreading more widely. Enjoining EO 202.68 would impair the State's critical ability to rapidly address developing hotspots, and would thereby endanger the public health.

## III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF NEW YORK'S MISSION TO PROTECT ITS CITIZENS FROM A GLOBAL PANDEMIC

As a final matter, the balance of equities and considerations of the public interest weigh decisively against Plaintiffs' request for injunctive relief.

"As the Supreme Court reaffirmed in *Winter* [555 U.S. at 20], a plaintiff seeking a preliminary injunction must demonstrate not just [likelihood of success and irreparable harm], but also that the 'balance of the equities tips in his favor and an injunction is in the public interest.'" *Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Svcs.*, 769 F.3d 105, 112 n.4. (2d Cir. 2014). These factors merge when the government is the opposing party. *L&M Bus Corp.*, 2018 WL 2390125, at *13.

The court must also ensure that the "public interest would not be disserved" by the preliminary injunction. *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010). Courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *N.Y.S. Rifle & Pistol Ass'n v. City of N.Y.*, 86 F. Supp. 3d 249, 258 (S.D.N.Y. 2015), *aff'd*, 883 F.3d 45 (2d Cir. 2018) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982)). This consideration includes the government's interest in public health. *Million Youth March, Inc.*

*v. Safir*, 155 F.3d 124, 125-26 (2d Cir. 1998) (it was necessary to consider the government's interest in the public health against First Amendment rights).

Here, Plaintiffs' interest in resuming unrestricted *in-person* sales of automobiles in the very areas where there has been a significant increase or spike of positive COVID-19 cases is clearly outweighed by the imperative need to prevent the infection spikes from rapidly increasing and spreading throughout New York City. New York saw firsthand how quickly COVID-19 can spread out of control, leading to an overwhelmed hospital system and a dramatic increase in severe illnesses and deaths. Zucker Decl.¶¶ 19-28. It is vital that the State Defendants be allowed to do everything possible to stop any case increases. *See Catholic Diocese* at 23 ("The public interest analysis, and accordingly the balance of equities, cuts in favor of the State, which is trying to contain a deadly and highly contagious disease.")*; Agudath* Tr. at 65:24-66:3 ("[T]he irreparable harm to the public is great when one balances hardship, death or permanent injuries to one's organs that can impair or change one's life as opposed to having to observe [] one's religion in a different way."); *see also Ass'n of Jewish Camp Operators*, 2020 WL 3766496, at *21 (injunction not in public interest due to "the unprecedented nature of the COVID-19 pandemic, the deadly nature of the virus itself, the lack of a vaccine. . . and lack of scientific agreement about its transmission").

Consequently, public interest and equitable concerns require that this Court deny Plaintiffs' motion. *See Winter*, 555 U.S. at 23-24 ("proper consideration" of the public interest and equitable factor "alone require[d] denial of the requested injunctive relief").

## CONCLUSION

For the reasons set forth above, it is respectfully requested that the Court deny Plaintiffs' motion for a preliminary injunction and grant such other and further relief as is just and proper.

Dated:  New York, New York          LETITIA JAMES
   October 20, 2020          Attorney General of State of New York
                ***Attorney for State Defendants***

By: ___/s/ *Jazini Dorcheh*___ _____
Maryam Jazini Dorcheh
Matthew L. Conrad
Assistant Attorneys General
28 Liberty Street, New York, NY 10005
(212) 416-6287