UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

PLAZA MOTORS OF BROOKLYN, INC. d/b/a PLAZA HONDA, PLAZA AUTOMOTIVE, LTD. d/b/a PLAZA KIA, CRYSTAL BAY IMPORTS LTD. d/b/a ACURA OF BROOKLYN, PLAZA OLDSMOBILE, LTD. d/b/a PLAZA TOYOTA, PLAZA HYUNDAI, LTD, d/b/a PLAZA HYUNDAI, AND CRYSTAL MOTORS OF BAYSIDE, LTD d/b/a PLAZA AUTO LEASING,

                                       Plaintiffs,

-against-

ANDREW M. CUOMO, Governor of the State of New York, in his official capacity, BILL DE BLASIO, Mayor of the City of New York, in his official capacity, and EMPIRE STATE DEVELOPMENT CORPORATION,

                                       Defendants.

------------------------------------------------------------------------ x

**DECLARATION OF DR. JAY VARMA**

20-CV-04851 (WFK)

**DR. JAY VARMA,** declares pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1. I am presently employed as Mayor Bill de Blasio's Senior Advisor for Public Health.

2. After graduating magna cum laude with highest honors from Harvard, I completed medical school, internal medicine residency, and chief residency at the University of California, San Diego School of Medicine. In 2001, I joined the Centers for Disease Control and Prevention ("CDC's") Epidemic Intelligence Service, working on foodborne diseases. From 2003 to 2008, I served in Bangkok, Thailand, directing CDC's TB programs and research in Southeast Asia. From 2008 to 2011, I served in Beijing, China, directing CDC's International Emerging Infections Program which assisted the Chinese government on infectious diseases.

1

From 2011 to 2017, I served as the Deputy Commissioner for Disease Control at the New York City Department of Health and Mental Hygiene. From 2017 to April 2020, I served as the Senior Advisor to Africa Centres for Disease Control and Prevention at the African Union in Addis Ababa, Ethiopia. I guided the creation of Africa CDC, developing its strategy and supporting implementation of its public health programs, and authored the Africa CDC's continent-wide strategy for COVID-19 in Africa and critical policy documents on COVID-19 control measures. I have authored 138 scientific manuscripts, six essays, and one book. A Captain in the United States Public Health Service, I have been recognized as the United States Public Health Service Physician Researcher of the Year (2010) and Physician Leader of the Year (2017), and have received the two highest awards in the U.S. Public Health Service (Distinguished Service Medal, 2011; Meritorious Service Medal, 2018).

3. I submit this declaration in support of defendant Bill de Blasio's opposition to the motion for a temporary restraining order ("TRO") and preliminary inunction ("PI"), enjoining enforcement of Governor Cuomo's Executive Order 202.68 (the "subject Order") issued on October 6, 2020.

4. The subject Order directed that the State Department of Health determine areas in the State that require enhanced public health restrictions due to severe increases in the number of cluster-based COVID-19 infections and imposes mitigating measures in those areas.

**A. The Zones Under the Subject Order**

5. The virus that causes COVID-19 infection has not been eliminated from the United States or anywhere in the world, because there is no medication that can cure infection and no vaccine that can prevent infection. Many people remain infected in the United States and the rest of the world, creating a large pool of infected people that can infect others.

6. COVID-19 is most commonly transmitted by small viral particles exhaled by an infected person that are deposited into the nose, mouth, and/or eyes of an uninfected person. These viral particles travel through the air.[1] The consensus by the CDC, World Health Organization ("WHO"), and other infectious disease experts is that the only way to limit illness and death from this infection is through a combination of measures, including: individual behaviors such as wearing masks, maintaining physical distance from others, washing hands, and completely avoiding contact with others when ill; widespread testing with isolation of cases and quarantine of contacts; and community social distancing measures.[2,3]

7. Community social distancing measures need to be adaptive to the state of the epidemic: when incidence rises in a specific area, such measures need to be imposed; when incidence declines, such measures can be progressively removed. It has been well demonstrated from many places throughout the United States and globally that imposition of community social distancing measures early during an increase in incidence effectively reduces transmission and allows more rapid removal of those restrictions.[4,5]

8. In geographic areas in which there is widespread transmission, community social distancing measures minimize the frequency, duration, and intensity of contact within the community and, thereby, substantially reduce infections, illnesses, and deaths. In the words of

---

[1] Infected people that are asymptomatic can spread the virus, and, if unaware they have the virus, pose a significant risk to the spread of the virus, as they will not be taking the necessary precautions to prevent further spread. However, if people are wearing face coverings, maintaining physical distance, and not gathering in large groups, that risk is significantly reduced.

[2] https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e2.htm?s_cid=mm6915e2_w

[3] https://www.who.int/publications/i/item/overview-of-public-health-and-social-measures-in-the-context-of-covid-19

[4] https://www.nature.com/articles/s41586-020-2405-7

[5] https://www.cdc.gov/mmwr/volumes/69/wr/mm6940e3.htm

the CDC, "[c]ommunity mitigation efforts aim to reduce the rate at which someone infected comes in contact with someone not infected, or reduce the probability of infection if there is contact. The more a person interacts with different people, and the longer and closer the interaction, the higher the risk of COVID-19 spread."[6]

9. The subject Order's zoned approach reflects the "community social distancing" approach by imposing mitigation steps in geographic areas with high positivity rates. The subject Order establishes three zones, and sets forth different restrictions for each zone. The red zone has the highest positivity rate. In these areas of New York City ("City"), the orange zone, or the "moderate severity" or "warning" zone, surrounds the red zone. The yellow zone, or the "precautionary zone," surrounds the orange zone.[7]

10. The greatest restrictions are in the red zones. Non-essential gatherings of any size are not permitted. Houses of worship are permitted to be open at up to 25% capacity or a maximum of 10 people, whichever is fewer. Restaurants may be open for take-out and delivery only. Certain essential businesses in the red zone are permitted to remain open, subject to restrictions on in-person workforce. By contrast, all other non-essential businesses in the red zone must be closed.

11. In the orange zones (moderate severity or warning), the subject Order prohibits non-essential gatherings greater than 10 people and allows up to 33% capacity in houses of worship or 25 people, whichever is fewer.[8] Restaurants may allow outdoor dining with a limit of four people per table. While certain other non-essential businesses (for which

---

[6] See https://www.cdc.gov/coronavirus/2019-ncov/community/community-mitigation.html

[7] See the following link for access to the current maps:
https://nycgov.maps.arcgis.com/apps/instant/lookup/index.html?appid=021940a41da04314827e2782d3d1986f

[8] It is my understanding, that the City will only be enforcing if a house of worship in the orange zone is above 50% capacity.

there is a high risk for virus transmission such as gyms and salons) must be closed, other non-essential businesses may operate at the same 50% capacity those businesses are operating at in the non-red zone areas of the City.

12. In the yellow zones (precautionary), non-essential gatherings greater than 25 people are prohibited, and up to 50% of capacity is allowed in houses of worship. That is, houses of worship in the yellow zone are under the same restriction as houses of worship in areas of the City not in a designated zone. Restaurants may be open for indoor dining (at 25% capacity in New York City) with each table seating no more than 4 people.

13. The multi-zone approach is necessary to prevent the spread of the virus beyond the high incidence areas. When a geographic area is identified as needing community social distancing measures, public health officials need to ensure that the restrictions take into account the fact that people on the outer edges of a zone border are likely to conduct activities on the other side of that border. Creating a "buffer" zone around the geographic area of widespread transmission is likely to help decrease the frequency, intensity, and duration of contact between people at highest risk of infection (those within the "red" zone) and those outside, but in close proximity, to the red zone.

B. **The Subject Order's Regulation of Car Dealerships**

14. It is my understanding that the plaintiffs in this case, a number of car dealerships located in a designated red zone, contend that the State should not impose restrictions on their in-person workforce under the subject Order because they have "had no positive COVID tests out of their hundreds of employees in the past six (6) weeks leading up to the enactment of EO 202.68 and no known COVID cases of customers who have visited the Dealerships throughout the COVID-19 pandemic." See Plaintiffs' First Amended Complaint ("Compl.") ¶

59. Plaintiffs claim that their businesses reopened on June 22, 2020 subject to compliance with the State's "Interim Guidance for Vehicle Sales, Leases, and Rentals During the COVID-19 Public Health Emergency." Compl. ¶ 51. Thereafter, pursuant to its authority to deem businesses "essential" under the subject Order, co-defendant Empire State Development Corporation ("ESD") determined that "essential" business included automotive sales conducted remotely or electronically, with in-person vehicle, showing, return, and delivery by appointment only.

15. The subject Order's reduction of in-person workforce contact in certain essential-businesses, such as plaintiffs' businesses, in the red zones, which contain the highest rate of COVID-19 transmission, is necessary to reduce the spread of the virus. Plaintiffs' car dealerships, by their very nature, draw patrons from a variety of neighborhoods throughout the City. For instance, it is common for people to enter the car dealerships (often without appointments) to look at and test drive vehicles, and wait to speak and negotiate with salespersons and financial managers for extended periods of time. Typically, car dealerships experience high levels of foot traffic and attract patrons from outside neighborhoods. By requiring plaintiffs' employees to work remotely or electronically, while at the same time permitting plaintiffs to schedule limited in-person appointments for vehicle showing, return, and delivery, the subject Order greatly reduces the frequency, intensity, and duration of person-to-person contact and the risk of large indoor gatherings, thus bearing a real and substantial relationship to curbing the spread of the virus.

16. As discussed above, the "community social distancing" approach depends not only on mitigating factors within the high-risk community, but also requires a zoned approach to create a buffer to help contain the outbreak. Closing non-essential businesses,

reducing the in-person workforce in essential businesses, and generally limiting gatherings in the red and orange zones are intended to help reduce the infection rates in those communities, while also deterring people from other communities from entering those communities. Allowing non-essential and essential businesses (such as plaintiffs' businesses) to reopen in the red zone would result in people from all over the City or State entering high and moderate risk communities, which is counterproductive to the zoned mitigation approach. In other words, the buffer zone would be filled with holes. Thus, in order to reduce the exposure of people from low-risk communities to people in the high and moderate risk communities, non-essential businesses must be closed in those communities and essential businesses must reduce their in-person workforce.[9]

## C. **Enforcement of the Subject Order is Necessary to Curb the Outbreak**

17. Enforcement of the subject Order is necessary and urgent. On August 10th, New York City had its lowest daily average of new cases (233) since the pandemic's peak. In early September, the number of cases started rising. On September 24th, the daily average for new cases was 352, a 50% increase in cases over 45 days. It then took only 12 days to increase another 50% to 567 cases on October 6th. Since the date of the October 6, 2020 subject Order, the daily average of new cases has begun to decline, and is currently 461 as of October 12, 2020. This slight reduction in the number of positive cases, along with positivity rates in the red zones that have more or less flattened or began to reverse over the last two weeks, as explained in paragraph 18 below, indicates that the combination of measures that have been taken (Phase 4

---

[9] Although it is possible that people in the red and orange zones go to work (or school) in a non-designated area of the City, and thus could potentially carry the virus with them, that is significantly different than bringing people from elsewhere into a red zone. There is a higher density of positive cases in the red and orange zones than elsewhere in the City, meaning that a person that travels into those zones is likely to encounter a greater number of infected people than if they remain outside those zones. Thus, the risk of people from outside the designated zones contracting the virus by going to school or work in those zones is much greater than the risk of a person from the red or orange zone transmitting the virus while they are working or attending school outside these zones.

restrictions and with the additional restrictions imposed by the subject Order) are having some positive effect

18. For the week ending October 15, 2020, the red zone in Brooklyn had a positivity rate of 7.83%, down from 8.07% the week prior. The positivity rate in the red zone in the Flushing, Queens area was 3.36%, down from 3.99%. The positivity rate in the red zone in the Rockaways, Queens area was 7.93%, up from 7.70%.[10] New York City's overall citywide rate is 1%. A positivity rate greater than or equal to 3% is used by New York City officials as an indicator that there are high levels of transmission in a community.[11] In addition to being over 3%, the magnitude of disparity between the citywide rate and a particular area is a warning sign that transmission in these communities is widespread and requires strong control measures to prevent spread beyond that community. The reproduction rate (or rate in which someone positive for COVID 19 spreads it to others) in New York City is estimated to be 1.12 (meaning a person positive for COVID 19 will typically infect just over one other person). Any reproduction rate above 1.0 is considered problematic for the control of the virus. While it is not possible to determine the reproduction rate for the zones (due to their small size), I believe that the reproduction rate is much higher in the red zones than citywide, and is likely driving the City's overall reproduction rate above 1.0. This means that the number of infected people in the City will progressively increase as each positive person infects multiple others.

---

[10] The State's positivity rates for these areas differ to some degree due to administrative differences in how they group cases by the date (e.g., report date vs. specimen collection date). Regardless of which approach is used, the State's numbers demonstrate the same trend of increased positivity rates in these particular areas.

[11] Increases above 3% are much more significant than increases below 3%. For instance, a change from 1% to 2%, while a 100% increase, is not as concerning from an epidemiological perspective as an increase from 3% to 4%. The reason is that percentage positivity is a proxy for the number of infections in a community. Statistics from jurisdictions throughout the United States and the world demonstrate that once infections cross a critical threshold, the increase in cases goes from being linear (a steady upward slope) to being exponential (a rapid upward slope that becomes steeper each day). *See* https://covid.cdc.gov/covid-data-tracker/#testing_testsperformed; https://www.who.int/docs/default-source/coronaviruse/situation-reports/20201012-weekly-epi-update-9.pdf.

19. New York City cannot risk a widespread resurgence of the virus. At least 19,237 people in the City have lost their lives to COVID-19. At least 243,975 New Yorkers have been infected in the City, of which 57,694 have been hospitalized.[12] Every New Yorker (and every American), has been socially, emotionally and economically impacted by the virus and the necessary restrictions imposed to mitigate it. New York City has carefully reopened, balancing the desire and need to return to pre-COVID-19 life, with the reality that the virus is still active, and under the threat of resurgence.

20. In order to maintain that progress and continue to avoid the loss of life, the City must be able to take proactive, swift and strong action to mitigate the spread of the virus in the designated zones pursuant to the subject Order. An order enjoining the enforcement of the subject Order places the City in a precarious situation, potentially undermining the months of careful reopening and progress.

Dated:   New York, New York
         October 20, 2020

                                                    Jay Varma, M.D.

---

[12] See https://www1.nyc.gov/site/doh/covid/covid-19-data.page