**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
− − − − − − − − − − − − − − − − − − − − − − − − − X
**PLAZA MOTORS OF BROOKLYN, INC. d/b/a**
**PLAZA HONDA, PLAZA AUTOMOTIVE,**
**LTD. d/b/a PLAZA KIA, CRYSTAL BAY**
**IMPORTS LTD. d/b/a ACURA OF**
**BROOKLYN, PLAZA OLDSMOBILE, LTD.**
**d/b/a PLAZA TOYOTA, PLAZA HYUNDAI,**
**LTD, d/b/a PLAZA HYUNDAI, AND**
**CRYSTAL MOTORS OF BAYSIDE, LTD d/b/a**
**PLAZA AUTO LEASING,**

Case No.: 1:20-cv-4851 (WFK) (SJB)

Plaintiff,

- against -

**ANDREW M. CUOMO,** Governor of the State of
New York, in his official capacity,

**BILL DE BLASIO,** Mayor of the City of New
York, in his official capacity, and

**EMPIRE STATE DEVELOPMENT**
**CORPORATION,**

Defendants.
− − − − − − − − − − − − − − − − − − − − − − − − − X

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' <u>MOTION TO DISMISS</u>

**MILMAN LABUDA LAW GROUP PLLC**
Jamie S. Felsen, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY  11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
jamiefelsen@mllaborlaw.com
emanuel@mllaborlaw.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

I.    **PRELIMINARY STATEMENT** ...................................................................1

II.   **FACTUAL & PROCEDURAL BACKGROUND** ..................................2

III.  **LEGAL STANDARD** .........................................................................6

IV.   **ARGUMENT** ...................................................................................8

    A.  Defendants' Motions Must be Denied ...........................................8

        i. **Equal Protection Claims** ................................................8

            **a. Theories under Equal Protection Claims** .....................10

            **b. Class of One** ...................................................................11

            **c. Selective Enforcement** ....................................................17

        ii. **Commerce Clause of Article 1, § 8 to the United States Constitution** ........25

        iii. **Contracts Clause of Article 1, § 10 to the United States Constitution** ......28

        iv. **Ninth & Tenth Amendments to the United States Constitution** ...............30

        v. **Violations under the Constitution of the State of New York** .....................32

    B.  Plaintiffs State Claims Against the City...............................................33

    C.  Alternatively, Plaintiffs Must be Granted Leave to Amend the Complaint.........34

V.    **CONCLUSION** .................................................................................34

# TABLE OF AUTHORITIES

**Cases**

Alfaro v. Labador,
    300 Fed. Appx. 85 (2d Cir. 2008) ...................................................................... 8

Aldridge v. Lamont,
    No. 3:20-CV-00924 (KAD), 2020 WL 7773415 (D. Conn. Dec. 30, 2020) ................... 33

Agudath Israel of Am. v. Cuomo,
    983 F.3d 620 (2d Cir. 2020) ...................................................................... 18 n. 2

Analytical Diagnostics Labs, Inc. v. Kusel,
    626 F.3d 135 (2d Cir. 2010) .......................................................................... 13

Assoc. of Surrogates & Supreme Court Reporters Within City of New York v. State of New York,
    940 F.2d 766 (2d Cir. 1991) .......................................................................... 29

AYDM Associates, LLC v. Town of Pamelia,
    205 F. Supp. 3d 252 (N.D.N.Y. 2016) ........................................................... 9, 17

Bd. of Managers of the 195 Hudson Street Condo. v. Jeffrey M. Brown Assocs., Inc.,
    652 F. Supp. 2d 463 (S.D.N.Y. 2009) .............................................................. 7

Brown v. City of Oneonta,
    221 F.3d 329 (2d Cir. 2000) .......................................................................... 10

Citizens Union of the State of New York v. Attorney General of the State of New York,
    2017 U.S. Dist. LEXIS 97514 (S.D.N.Y. June 23, 2017) ................................... 33

City of Cleburne v. Cleburne Living Ctr., Inc.,
    473 U.S. 432 (1985) .......................................................................... 9, 11, 12, 17

Cty. of Butler v. Wolf,
    No. 2:20-CIV.-677, 2020 WL 5510690 (W.D. Pa. Sept. 14, 2020) ..................... 8, 16

CSX Transp., Inc. v. N.Y. State Office of Real Prop. Servs.,
    306 F.3d 87 (2d Cir. 2002) .......................................................................... 32

CTS Corp. v. Dynamics Corp. of America,
    481 U.S. 69 (1987) .......................................................................... 26

Doe v. Village of Mamoroneck,
    462 F. Supp. 2d 520 (S.D.N.Y. 2006) .......................................................... 11

Enquist v. Or. Dept. of Agric.,
    553 U.S. 591 (2008)............................................................................ 12

*Ex Parte* Young,
    209 U.S. 123 (1908)...................................................................... 32, 33

Feldheim v. Fin. Recovery Services, Inc.,
    257 F. Supp. 3d 361 (S.D.N.Y. 2017)............................................... 6, 7

Fortress Bible Church v. Feiner,
    694 F.3d 208 (2d Cir. 2012)............................................................. 13

Floyd v. City of N.Y.,
    959 F. Supp. 2d 540 (S.D.N.Y. Aug. 12, 2013)................................ 10

Friends of Animals v. Romero,
    948 F.3d 579 (2d Cir. 2020)............................................................. 16

Gagliardi v. Vill. of Pawling,
    18 F.3d 188 (2d Cir. 1994).................................................................. 9

Gonzalez v. Option One Mortg. Corp.,
    No. 12-CIV.-1470, 2014 WL 2475893 (D. Conn. June 3, 2014) ....... 6

Graham v. Richardson,
    403 U.S. 365 (1971).......................................................................... 17

Hampshire Recreation, LLC v. Village of Mamaroneck,
    No. 14-CIV.-7228 (CS), 2016 WL 1181727 (S.D.N.Y. 2016)...... 14, 24

Harlen Assocs. v. Inc. Vill. of Mineola,
    273 F.3d 494 (2d Cir. 2001)............................................................ 9, 15

Hayden v. Cnty. of Nassau,
    180 F.3d 42 (2d Cir.1999)................................................................. 34

Healy v. Beer Inst., Inc.,
    491 U.S. 324 (1989)...................................................................... 26, 27

Hu v. City of New York,
    927 F.3d 81 (2d Cir. 2019)............................................................... 11

Idaho v. Coeur D'Alene Tribe,
    521 U.S. 261 (1997).......................................................................... 32

iv

Jacobson v. Massachusetts,
    197 U.S. 11 (1905) ................................................................................................ 2, 7, 8

JAV Auto Center, Inc. v. Behrens,
    No. 05-CIV.-6503 (CS) (GAY), 2008 WL 9392107 (S.D.N.Y. 2008) .......................... 15

Kisembo v. NYS Office of Children and Family Servs.,
    285 F. Supp. 3d 509 (N.D.N.Y. 2018) ...................................................................... 10, 11

Kramer v. Union Free School District No. 15,
    395 U.S. 621 (1969) ........................................................................................................ 18

Lebanon Valley Auto Racing Corp. v. Cuomo,
    No. 1:20-cv-804 (LEK) (TWD), 2020 WL 4596921 (N.D.N.Y. Aug. 11, 2020) ............ 25

Lederman v. New York City Dept. of Parks and Recreation,
    901 F. Supp. 2d 464 (S.D.N.Y. 2012) ............................................................................ 16

Lewis v. Thompson,
    252 F.3d 567 (2d Cir. 2001) .............................................................................................. 9

Lilakos v. New York City,
    808 Fed. Appx. 4 (2d Cir. 2020) ............................................................................... 13, 24

Matter of Lasertron, Inc. v. Empire State Dev. Corp.,
    2021 N.Y. Slip. Op. 21001, 2021 WL 28456 (Jan. 4, 2021) ...................................... 15, 19

McLaughlin v. Florida,
    379 U.S. 184 (1964) ........................................................................................................ 17

Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills,
    815 F. Supp. 2d 679 (S.D.N.Y. 2011) ...................................................................... 11, 17

Neroni v. Coccoma,
    No. 13-CIV.-1340, 2014 WL 2532482 (N.D.N.Y. June 5, 2014) ..................................... 6

Omnistone Corp. v. Cuomo,
    No. 20-CIV.-2153 (GRB), 2020 WL 8172761 (E.D.N.Y. May 15, 2020) ...................... 29

Pike v. Bruce Church,
    397 U.S. 137 (1970) ................................................................................................ 25, 27

Pyke v. Cuomo,
    258 F.3d 107 (2d Cir. 2001) ............................................................................................ 10

Roman Catholic Diocese of Brooklyn v. Cuomo,
    141 S.Ct. 63 (2020)........................................................ 5, 7, 13, 15, 18, 19, 20, 21 n. 4, 29

Romer v. Evans,
    517 U.S. 620 (1996)........................................................................................ 11

Rowan v. Laborers Int'l Union of N. Am.,
    2012 U.S. Dist. LEXIS 110278 (E.D.N.Y. 2012).............................................. 7

San Antonio School District v. Rodriguez,
    411 U.S. 1 (1973)............................................................................................ 10

Savino v. Town of Southeast,
    983 F. Supp. 2d 293 (S.D.N.Y. 2013)............................................................. 10

Shapiro v. Thompson,
    394 U.S. 618 (1969)........................................................................................ 18

Skinner v. Oklahoma ex rel. Williamson,
    316 U.S. 535 (1942)........................................................................................ 18

Sobel v. Prudenti,
    25 F. Supp. 3d 340 (E.D.N.Y. 2014) ............................................................... 7

Tolchin v. Supreme Court of the State of New Jersey,
    111 F.3d 1099 (1997)...................................................................................... 25

U.S. v. Jimenez,
    895 F.3d 228 (2d Cir. 2018)........................................................................... 17

U.S. R.R. Retirement Bd. v. Fritz,
    449 U.S. 166 (1980)........................................................................................ 16

Verizon Md. Inc. v. PSC,
    535 U.S. 635 (2002)........................................................................................ 32

Vill. of Willowbrook v. Olech,
    528 U.S. 562 (2000)................................................................................... 11, 12

Warren v. US.,
    859 F. Supp. 2d 522 (W.D.N.Y. 2012) ........................................................... 31

Zahra v. Town of Southold,
    48 F.3d 674 (2d Cir. 1995).............................................................................. 17

Zobel v. Williams,
  457 U.S. 55 (1982) ................................................................................. 11, 12

**Constitutional Authority**

U.S. Const. amend. IX .................................................................................. 30, 31

U.S. Const. amend. X .................................................................................... 30, 31

U.S. Const. Art. I, § 8 .................................................................................... 25

U.S. Const. Art. I, § 10, cl. 1 ......................................................................... 28

**Rules**

Fed. R. Civ. P. 12 ......................................................................................... 6, 7

Fed. R. Civ. P. 15 ......................................................................................... 3, 34

Fed. R. Civ. P. 19 ......................................................................................... 34

**Executive Orders**

Executive Order No. 202.68 (2020) ........................................................... *passim*

**Other Sources**

Cluster Action Initiative Announcement, https://www.governor.ny.gov/news/governor-cuomo-announces-new-cluster-action-initiative .......................................... 22 n. 6

Cluster Action Initiative Guidance, https://esd.ny.gov/ny-cluster-action-initiative-guidance .................................................................................................. 20 n. 3

ESD Guidance, https://esd.ny.gov/guidance-executive-order-2026 .............. 4 n. 1, 6

Failure by Local Governments to Adhere to Order and Enforce Public Health Regulations Can Result in Penalties of up to $10,000 per Day" at https://www.governor.ny.gov/news/governor-cuomo-directs-doh-commissioner-issue-section-16-order-covid-19-hot-spot-local ......... 33

GNYADA Guidance, http://www.gnyada.com/COVID-19/remote/ .................... 4 n. 1

Gov. Cuomo Warns NYC Leaders to Step Up Mask and Social Distancing Enforcement, Could Hit City With $10,000 Fine, https://newyork.cbslocal.com/2020/10/03/nyc-covid-19-cluster-enforcement/ ................................................................................. 33

N.J., Conn. Qualify for Tri-State Travel Advisory List, But Gov. Cuomo Says It's Not Logistically Possible To Add Them Now, https://newyork.cbslocal.com/2020/10/20/tri-state-area-travel-advisory-coronavirus-covid-19-new-jersey-connecticut-new-york/ ..... ......... 24 n. 7

New York Gov. Andrew Cuomo holds a news conference on coronavirus — 10/21/2020, https://www.youtube.com/watch?v=EFHUvtFY7fY&feature=emb_title.......................... 24 n. 7

<u>**PRELIMINARY STATEMENT**</u>

Plaintiffs Plaza Motors of Brooklyn, Inc. d/b/a Plaza Honda, Plaza Automotive, Ltd. d/b/a Plaza Kia, Crystal Bay Imports, Ltd. d/b/a Acura of Brooklyn, Plaza Oldsmobile, Ltd. d/b/a Plaza Toyota, Plaza Hyundai, Ltd, d/b/a Plaza Hyundai, and Crystal Motors of Bayside, Ltd d/b/a Plaza Auto Leasing, (hereinafter the "Plaintiffs" or the "Dealerships") submit this memorandum of law in opposition to the motion to dismiss the complaint filed by Defendants Andrew M. Cuomo ("Cuomo"), Empire State Development Corporation ("ESD") (Cuomo and ESD collectively hereinafter the "State"), and Bill de Blasio ("de Blasio" or the "City").

In almost a stubborn refusal to recognize that this Court has twice issued Orders denying a stay of discovery, which Plaintiffs respectfully submit inherently represents a finding that Plaintiffs' causes of action state a claim for relief, Defendants press on with what can only be categorized as a stall tactic.  The complaint in this case was filed on October 8, 2020; despite the fact that 3 ½ months, Defendants have not provided the very data Defendants claim to have relied upon in making their decision to place Plaintiffs in a red zone in violation of Plaintiffs' constitutional rights.  Instead, shortly after the commencement of this action, Defendants arbitrarily removed Plaintiffs from the red zone in a feeble attempt to intimate the issue is moot; all the while, Executive Order No. 202.68 ("EO 202.68") remains in effect, serving as a Sword of Damocles over Plaintiffs' dealerships.

This act places Plaintiffs under the constant threat of enforcement of EO 202.68 (after already causing significant damages to Plaintiffs during the period that EO 202.68 placed Plaintiffs in the red zone) whilst failing to establish any basis whatsoever for the proposition that these *increased* measures, far and above the already buckling measures implemented to which Plaintiffs do not object, somehow magically prevent the spread or transmission of COVID-19.

Perhaps the most poignant way to establish the Defendants' lack of reasonableness is the fact that, while the State agrees that tiered constitutional analysis applies, the City irrationally maintains that the standard of review under <u>Jacobson</u> applies.  Defendants maintain that the measures undertaken in EO 202.68 are designed to save lives and point to the statistics of the death toll of COVID-19.  However, it is undisputed that there was no scientific evidence when EO 202.68 was implemented, nor is there any such evidence now, that prohibiting dealerships within arbitrarily defined red zones from having walk-in customers, while permitting dealerships just a mile or two outside the red zone to have them, in no way serves the Defendants' expressed purpose of preventing the spread or transmission of COVID-19; even if it did, the complaint adequately alleges that the measures under EO 202.68 are not sufficiently *narrowly tailored* to achieve the Defendants' compelling state interest in saving lives.

Indeed, numerous courts, including the United States Supreme Court, have granted injunctive relief against the government, finding not only that such complaints state claims for relief, but are likely to succeed on the merits.  In providing this relief, these courts have unequivocally found no basis for the government's decisions, that the government has come up empty-handed with any scientific evidence supporting their decisions, and that the checks and balances put in place by the Founding Fathers were specifically designed to prevent the very abuse of power and discretion wielded by our elected officials in the State of New York.

Accordingly, Defendants' motion to dismiss must be denied.

## **FACTUAL & PROCEDURAL BACKGROUND**

On October 8, 2020, Plaintiffs commenced this action against Defendants and sought a temporary restraining Order and preliminary injunction.  <u>See</u> Docket Entry 1.

2

The following day, this Court denied Plaintiffs' motion for a temporary restraining Order and scheduled a hearing for October 22, 2020.  <u>See</u> Docket Entry 13.  On October 16, 2020, Plaintiffs amended their complaint as of right pursuant to Rule 15(a)(1)(A) of the Federal Rules of Civil Procedure (hereinafter referred to as "Rule" or "Rules").

In the State's opposition to Plaintiffs' motion for injunctive relief, it submitted the Declaration of Howard A. Zucker ("Dr. Zucker"), Commissioner of Health of New York State, and the City submitted the Declaration of Dr. Jay Varma ("Dr. Varma"), the City's Senior Advisor for Public Health.  Drs. Zucker and Varma assert that "data" showing that the boundary lines created for the "red zones" were rationally drawn around the areas with the highest COVID-19 spikes, after considering multiple factors, including: (i) 7-day rolling average positivity rates; (ii) population size and density in a given geographic area; and (iii) whether the spike in infection rates may be explained by a cluster in a single institution (e.g., nursing home, factory, college, etc.) rather than transmission throughout the community at large.  <u>See</u> Docket Entry 22 at 14 ¶ 56.

However, the underlying data supporting Defendants' declarations is glaringly absent from their declarations and has not been made available to the public or provided in this litigation. For example, no information has been provided by Defendants concerning the number of people tested and the number of those people tested positive, nor is information provided about where these individuals reside.  Critically, according to Dr. Zucker, positive cases **<u>declined</u>** leading up to the implementation of the red zone in which Plaintiffs were located.  Dr. Zucker declared that, in the three (3) weeks leading up to the implementation of EO 202.68, the positivity rate in the red zone where Plaintiffs are located was decreasing: according to him, it was 7.67% the week of September 20 through 26, 2020, 6.69% the week of September 27 through October 3, 2020, and 5.86% during the week of October 4 through 10, 2020.  <u>See</u> Docket Entries 20 at 6 and 22 at 12 ¶¶ 48-49.

This begs the question: what was the basis (under any constitutional standard) for the creation and enforcement of the red zone at that time since, according to the Commissioner of Health of New York State, positive cases in the red zone were declining immediately leading up to the implementation of the red zone?

On October 21, 2020, the Plaintiffs' motion for a preliminary injunction was fully submitted and the Court heard argument the following day; this motion remains *sub judice*.  See Docket Entries 4-7, 20-23, 26-27, and Text Only Minute Entry Order dated October 29, 2020 reserving decision.   On October 23, 2020, the parties supplemented their motion concerning whether EO 202.68 prohibited any in-person negotiations at Plaintiffs' dealerships.  See Docket Entries 28-29.[1]  On November 3, 2020, Defendants moved by letter for a pre-motion conference in anticipation of their motion to dismiss and sought a stay of discovery; Plaintiffs opposed the following day.  See Docket Entries 33-34.  On November 5, 2020, this Court denied Defendants' motion for a stay of discovery, denied the letter motion for a pre-motion conference as moot, and granted leave for Defendants to move for dismissal with a briefing schedule.  See Text Only Order dated November 5, 2020.

---

[1] During argument on October 22, 2020, Defendant Cuomo repeatedly represented that, while Plaintiffs are in the red zone, although walk-in customers looking to purchase a vehicle are not permitted, Plaintiffs may conduct negotiations in-person so long as customers make an appointment in advance.  However, that is not what the ESD Guidance states.  It permits "automotive sales conducted remotely or electronically, with in-person vehicle showing, return, and delivery by appointment only."   See  https://esd.ny.gov/guidance-executive-order-2026.  Plaintiffs and the Greater New York Automobile Dealers Association ("GNYADA") interpret EO 202.68 and the EDS's Guidance to require that sales must be handled remotely, such that: (i) employees involved in the sale or lease of a vehicle cannot conduct these transactions on the dealership premises; (ii) *all negotiations must be done using the telephone or electronic methods*; and (iii) sales department workers cannot even report to work to use phones and computers to contact consumers.  See http://www.gnyada.com/COVID-19/remote/ (as of October 23, 2020) (emphasis added).  This only further highlights the vagueness and arbitrariness of EO 202.68 as applied to Plaintiffs.

On November 6, 2020, Defendant Cuomo announced updated red zones and Defendants submitted a letter to the Court on November 10, 2020 stating that Plaintiffs were no longer in the red zone and thus argued that this case became moot.  See Docket Entry 36.  Plaintiffs responded by letter the same day arguing, once again, that no mootness implications apply and that this case remains justiciable.  See Docket Entry 37.

On November 25, 2020, the United States Supreme Court granted injunctive relief to Roman Catholic Diocese of Brooklyn and Agudath Israel of America and enjoined the Defendants from enforcing EO 202.68.  See Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S.Ct. 63 (2020).

On November 30, 2020, Plaintiffs supplemented their brief in support of their motion for a preliminary injunction with arguments concerning the Roman Catholic Diocese decision and requested that the Court grant their motion for injunctive relief such that Defendants be enjoined from enforcing EO 202.68 in its entirety and, alternatively, for the Court to enter an Order enjoining Defendants from enforcing EO 202.68 as it applies to Plaintiffs.  See Docket Entry 40. Pursuant to this Court's Order dated the same day, Defendants responded to Plaintiffs' letter supplementing their motion on December 11, 2020, and Plaintiffs submitted a reply in further support on December 18, 2020.  See Text Only Status Report Order dated November 30, 2020 and Docket Entries 43, 45, and 50.

On December 11, 2020, Defendants filed a letter motion for reconsideration of the Court's Order denying a stay of discovery.  See Docket Entry 46.  Plaintiffs opposed on December 14, 2020, and this Court denied Defendants' motion again the following day.  See Docket Entries 47, 49.  On December 11, 2020, the State and the City each served their notices of motion to dismiss with accompanying memorandum of law in support.  See Docket Entries 42 and 44.

To date, though Defendants have selectively provided some information, outlined above, in support of their decisions as it relates to the red zone, neither the State nor the City submitted any evidence of the underlying data which would support their decision to place the red zone where Plaintiffs operate, nor did Defendants provide data outside of the red zone as a comparator; further, the Defendants altogether failed to provide any scientific evidence establishing that forcing the Plaintiffs to conduct sales by appointment only while permitting a dealership a mile away to allow walk-in customers in any way will reduce the spread or transmission of COVID-19 despite the fact all dealerships, inside and outside the red zone, are already required to (and do) operate under the Interim Guidance for Vehicle Sales, Leases, and Rentals During the COVID-19 Public Health Emergency (hereinafter the "Guidelines").

## LEGAL STANDARD

The standards of review applicable in motions to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) are substantively identical. See Gonzalez v. Option One Mortg. Corp., No. 12-CIV.-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) (internal citations omitted); see also Neroni v. Coccoma, No. 13-CIV.-1340, 2014 WL 2532482, at *4 (N.D.N.Y. June 5, 2014) (same).

"In deciding both types of motions, the Court must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff." See Gonzalez, 2014 WL 2475893, at *2 (internal citations omitted); see also Feldheim v. Fin. Recovery Services, Inc., 257 F. Supp. 3d 361, 366 (S.D.N.Y. 2017) (same).

However, "[o]n a Rule 12(b)(1) motion . . . the party who invokes the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6)." See Gonzalez, 2014 WL 2475893, at *2.

"In contrast to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." See Sobel v. Prudenti, 25 F. Supp. 3d 340, 352 (E.D.N.Y. 2014) (internal quotation marks omitted)). This allocation of the burden of proof is "[t]he only substantive difference" between the standards of review under these two rules. See Feldheim v. Fin. Recovery Services, Inc., 257 F. Supp. 3d at 366.

In determining Defendants' Rule 12(b)(6) motion, the court is permitted to rely on the public record of this case in addition to the allegations in the complaint, documents appended to the complaint, and matters of which judicial notice may be taken.  See Rowan v. Laborers Int'l Union of N. Am., 2012 U.S. Dist. LEXIS 110278, at *14 (E.D.N.Y. 2012) (citing Bd. of Managers of the 195 Hudson Street Condo. v. Jeffrey M. Brown Assocs., Inc., 652 F. Supp. 2d 463, 471 (S.D.N.Y. 2009) (finding that a court may rely on matter of public record in deciding a motion to dismiss under FRCP 12(b)(6)).

Defendants argue that the deferential standard under Jacobson v. Massachusetts, 197 U.S. 11 (1905), applies despite the fact that the Supreme Court has resoundingly rejected Jacobson as authoritative in constitutional law claims during a pandemic.  See Roman Catholic Diocese, 141 S.Ct. at 70.  Indeed, ordinary constitutional scrutiny is necessary in this case to maintain the independent judiciary's role as a guarantor of constitutional liberties – even in an urgent situation. While principles of balancing may require courts to give lesser weight to certain liberties for a time, the judiciary cannot abrogate its own critical constitutional role by employing an overly deferential standard.  See Roman Catholic Diocese, 141 S.Ct. at 68 ("even in a pandemic, the Constitution cannot be put away and forgotten"), and 72 ("there is no world in which the Constitution tolerates color-coded executive edicts …").

7

Over the last century, federal courts have developed a regimen of tiered scrutiny for examining most constitutional issues—rational basis scrutiny, intermediate scrutiny and strict scrutiny. See Cty. of Butler v. Wolf, No. 2:20-CIV.-677, 2020 WL 5510690, at *6 (W.D. Pa. Sept. 14, 2020).  The appropriate standard depends on the nature of the claim and, specifically, the nature of the right allegedly infringed.  Id.  This Court must apply "regular" constitutional scrutiny to the issues in this case, due to the ongoing and open-ended nature of the restrictions and the need for an independent judiciary to serve as a check on the exercise of emergency government power militate against the application of a more deferential level of review under Jacobson.  Id. at *8.

Plaintiffs address the appropriate level of scrutiny to apply for each claim below.

## ARGUMENT

### A.  Defendants' Motion Must be Denied

#### i.    Equal Protection Claims

Defendants argue that the Plaintiffs' equal protection claims must be dismissed because they fail to plausibly allege that (1) they are similarly situated with dealerships located outside the red zones, or (2) they are intentionally treated differently based on impermissible considerations. However, Plaintiffs are not obligated to show a better-treated, similarly-situated group of individuals in order to establish a claim of lack of equal protection, so long as Plaintiffs have alleged that a facially-neutral law has been applied in an intentionally-discriminatory manner. See Alfaro v. Labador, 300 Fed. Appx. 85, 87 (2d Cir. 2008) (stating the foregoing standard and holding that allegation of zoning variance applicant that government denied his application for a variance because he was Hispanic was sufficient to permit applicant to advance evidence that the defendants violated his clearly established constitutional rights).

8

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." See City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). "[T]he equal protection guarantee ... extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." See Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).

"To state an equal protection claim, a plaintiff must charge a governmental officer 'not only with deliberately interpreting a statute against the plaintiff, but also with singling him out alone for that misinterpretation.'" See Gagliardi v. Vill. of Pawling, 18 F.3d 188, 193 (2d Cir. 1994). Where a plaintiff is not a member of a constitutionally protected class, "he may bring an equal protection claim pursuant to one of two theories: (1) selective enforcement, or (2) 'class of one.'" See AYDM Associates, LLC v. Town of Pamelia, 205 F. Supp. 3d 252, 265 (N.D.N.Y. 2016) (citation omitted).

Defendants' principal argument is that the correct standard of review for equal protection claims is the rational basis test, and that under that standard, courts will not strike down laws as irrational simply because it may not succeed in bringing about the result it seeks to accomplish, because the problem could have been better addressed in some other way, or because the law's classifications lack razor-sharp precision. However, there still needs to be a "*rational relationship* between the *disparity of treatment* and some legitimate governmental purpose." See Lewis v. Thompson, 252 F.3d 567, 582 (2d Cir. 2001) (citation omitted) (emphasis added).

The government cannot establish with *any* level of rationality that it can arbitrarily further restrict some dealerships from having walk-in customers while permitting similarly situated dealerships to continue accepting walk-ins. Even if they aren't required to support their decisions with empirical data, their refusal to provide it, *while claiming they relied on it*, evinces irrationality.

9

### a.      Theories under Equal Protection Claims

In analyzing an equal protection claim, the Court "must decide, first, whether [the challenged state conduct] operates to the disadvantage of some suspect class or impinges a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict scrutiny ... If not, the scheme must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination ..." See San Antonio School District v. Rodriguez, 411 U.S. 1, 17 (1973).

An equal protection claim may be pled in a number of different ways. First, "[a] plaintiff could point to a law or policy that 'expressly classifies persons on the basis of race [or religion].'" See Kisembo v. NYS Office of Children and Family Servs., 285 F. Supp. 3d 509, 523 (N.D.N.Y. 2018) (quoting, inter alia, Brown v. City of Oneonta, 221 F.3d 329, 337 (2d Cir. 2000)).

Second, "a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner." Id. (quoting Brown, 221 F.3d at 337)) (citation omitted).

Third, "[a] plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." Id. at 523–24 (quoting Floyd v. City of N.Y., 959 F. Supp. 2d 540, 570 (S.D.N.Y. Aug. 12, 2013)) (citation omitted).  A plaintiff alleging an equal protection claim under any of these theories "generally need not plead or show the disparate treatment of other similarly situated individuals."  See Pyke v. Cuomo, 258 F.3d 107, 108–09 (2d Cir. 2001).  Alternatively, "a plaintiff may assert a 'selective enforcement' claim by showing [he was] treated differently based on impermissible considerations such as … religion, … or malicious or bad faith intent to injure a person." See Kisembo, 285 F. Supp. 3d at 524 (quoting Savino v. Town of Southeast, 983 F. Supp. 2d 293, 301 (S.D.N.Y. 2013)).

"[A plaintiff] may [also] assert a so-called 'class of one' claim by alleging that [he was] intentionally treated differently from others similarly situated and that there was no rational basis for this difference in treatment." Id. (internal quotations omitted) (quoting Doe v. Village of Mamoroneck, 462 F. Supp. 2d 520, 558 (S.D.N.Y. 2006)).  The aforementioned theories of liability "require a showing of similarly situated individuals or groups who were treated differently."  See Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011).

Here, Plaintiffs state claims under both a class-of-one theory, where rational basis review applies, and under a selective enforcement theory, where strict scrutiny applies.

### b.    Class of One

To succeed under a class-of-one theory, a plaintiff must establish that he was "intentionally treated differently from others similarly situated and 'there is no rational basis for the difference in treatment.'"  See Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)).  A plaintiff need not prove "a defendant's subjective ill-will towards a plaintiff," and can prevail on a class-of-one claim based on similarity alone.  See Hu v. City of New York, 927 F.3d 81, 93 (2d Cir. 2019). "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."  See City of Cleburne, 473 U.S. at 446.

 The rational-basis test prohibits the government from imposing restrictions on liberty that are irrational or arbitrary and allows courts to examine each distinction drawn to ensure that it is at least rational.  See, e.g., Zobel v. Williams, 457 U.S. 55, 60 (1982) (when the government distinguishes between its citizens, "the distinctions it makes are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment."); accord Romer v. Evans, 517 U.S. 620, 632 (1996) ("even in the ordinary equal protection cases calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained").

Illustrative of this principle is the Supreme Court's decision in <u>Zobel</u> — a case that involved an equal-protection challenge to an Alaskan program that distributed oil revenue each year to citizens based on the length of their state residency.  See <u>Zobel</u>, 457 U.S. at 61-62.  In <u>Zobel</u>, the state argued two rationales for this policy: (1) new residents were encouraged to move to the sparsely populated Alaska; and (2) existing residents were given a stake in the prudent management of oil reserves.  <u>Id.</u> at 61.  The Supreme Court found that both of these interests were legitimate, but the Court nonetheless invalidated the distinction based on length of state residency. <u>Id.</u> at 61-63.

First, the Court found that there was no logical basis for the proposition that discriminating in favor of long-term residents would encourage population growth. <u>Id.</u> at 62, n. 9.

Second, giving citizens a financial stake in natural resources also was not served any more or any less by such discrimination.  <u>Id.</u> at 62-63.  Thus, the <u>Zobel</u> decision illustrates that a reviewing court is not required to accept as true the state's speculation that a law furthers its identified interest, but, instead, *a court must examine the actual effect that any classification has in supporting the purported state interest*.  See <u>Zobel</u>, 457 U.S. at 61-63 (emphasis added); <u>City of Cleburne</u>, 473 U.S. at 449 (citing the district court's post-trial findings of fact and the appellate court's reliance on those findings when holding that even if a home being too big was a valid reason for denying a permit, the fact that homes of identical size were routinely granted permits rendered such a reason alone illogical and irrational as a ground to deny a permit); <u>Vill. of Willowbrook</u>, 528 U.S. at 565 (*per curiam*); <u>Enquist v. Or. Dept. of Agric.</u>, 553 U.S. 591, 602-03 (2008) ("the complaint [sufficed because it alleged] . . . differential treatment [that] raised a concern of arbitrary classification, and … required the State to provide a rational basis for it").

Plaintiffs respectfully submit that they have sufficiently alleged that there is no rational basis for the difference in forbidding Plaintiffs from operating their dealerships with an in-person sales workforce while permitting all dealerships outside the red zone to operate at full force. The only difference between Plaintiffs and the similarly situated dealerships is their location; they otherwise were previously permitted to operate equally until EO 202.68. Indeed, Defendants' rationale based on data they claim they relied upon, but have not supplied, is anything but rational.

To meet the class-of-one similarly situated test, the plaintiffs must provide "specific facts showing that the comparators are 'similar in relevant respects.'" See Lilakos v. New York City, 808 Fed. Appx. 4, 8-9 (2d Cir. 2020) (citing Analytical Diagnostics Labs, Inc. v. Kusel, 626 F.3d 135, 143 (2d Cir. 2010)); Fortress Bible Church v. Feiner, 694 F.3d 208, 222 (2d Cir. 2012) (holding that comparators for the similarly-situated analysis need not be similar in all respects, but rather, only "with regard to discrete issues"). The Second Circuit's Fortress decision expanded the range of potential comparators, and the plaintiffs are permitted to identify multiple comparators who are similarly-situated in critical, though perhaps not all, respects. See Fortress, 694 F.3d 222.

Here, again, there is no difference between the dealerships in the red zone and those outside other than their geographical location based on Defendants' drawing of a map to outline the red zone. While Defendants claim that the dealerships outside the red zone are not similarly situated, they have unsuccessfully argued that the religious institutions in Roman Catholic Diocese were treated more favorably than businesses who were required to be closed regardless of whether they were in the red zone. See 141 S.Ct. at 76-77. As explained by the United States Supreme Court, Defendants must justify their actions; therefore, Defendants must explain why the dealerships in the red zone must close their doors to walk-ins while dealerships outside the red zone may keep their doors open. Id. at 73.

Because the complaint here adequately alleges that dealerships outside the red zone are treated more favorably without any rational basis, Plaintiffs appropriately state a claim for relief. Indeed, no rational person could regard Plaintiffs' circumstance of being located in a so called "red zone" to differ from a competing dealership outside of any such "red zone," especially when all dealerships are required to comply with the Guidelines which sufficiently and rationally address the dangers of COVID-19 transmission.  There is no basis whatsoever for the notion that operating Plaintiffs' dealerships in the so called "red zone" whilst complying with the Guidelines creates any greater risk than operating any dealership outside of any such "red zone" that complies with the Guidelines.

While the State would have this Court believe that the rational-basis test is a rubber-stamp, the case law discussed *supra* makes clear that this test is not toothless, and, instead, requires careful and deliberate scrutiny of whether the discriminatory classification logically furthers the purported state interests.  As discussed herein, the Defendants fail to establish how the *increased* measures will further the goal of preventing the spread or transmission of COVID-19 and fail to provide any scientific evidence that operating the dealerships under the already burdensome guidelines is insufficient to protect against the spread of COVID-19.

In support of their motion, Defendants cite to several cases, all of which are inapposite and unavailing.  In Hampshire Recreation, LLC v. Village of Mamaroneck, the plaintiff, which was located in two separate zoning districts, challenged the zoning regulations and argued in support of its equal protection claims that three (3) similarly situated businesses were treated more favorably, albeit those businesses were entirely within a single zoning district.  See 2016 WL 1181727.  This is not the case here; Plaintiffs' dealerships are exactly identical to dealerships outside the red zone, and the red zone itself is not a zoning district.

14

In <u>JAV Auto Center, Inc. v. Behrens</u>, the plaintiff towing company challenged the government's cancellation of its contract, which it claimed was done in retaliation for plaintiff's exposure of alleged corruption, and the court there merely found that it had not provided evidence, by affidavit or sworn testimony or even documents sufficient to establish the circumstances, to show that the conduct of other garages were not disciplined for conduct similar to it.  <u>See</u> 2008 WL 9392107.  The complaint here does not suffer from this infirmity, as it clearly alleges that dealerships outside the red zone were permitted to operate under the Guidelines, while the Plaintiffs were required to operate under increased measures.

In <u>Harlen Assocs.</u>, the plaintiff challenged a decision denying an application to operate a convenience store closer to a school than other convenience stores because, among other things, it would entice school children to use a dangerous sidewalk.  <u>See</u> 273 F.3d 494.  <u>Harlen</u> is not remotely similar to the facts in this case, as that decision dealt with a single business whereas the law challenged here – EO 202.68 – has a sweeping effect on many businesses and religious institutions.

Notably, Defendants have already been enjoined from enforcing the law challenged here by the United States Supreme Court and the Supreme Court of the State of New York, Erie County who recently granted injunctive relief against the State from restricting a business from operating.  <u>See</u> <u>Roman Catholic Diocese</u>, *supra*, and <u>Matter of Lasertron, Inc. v. Empire State Dev. Corp.</u>, 2021 WL 28456 (holding, under Article 78 of the NY CPLR, that the government's actions are arbitrary, capricious, and lack any rational basis, and stating: "Judicial deference has its limits. Here, considering the record shows full compliance by Lasertron with state-imposed requirements -- to the satisfaction of [the government] - *and <u>no</u> <u>scientific</u> <u>evidence</u> of any coronavirus transmission from its facility* … only goes to prove the Court's concern") (emphasis added).

15

Similarly, Defendants' argument that their line-drawing is beyond reproach fails to pass muster. In support of this argument, Defendants cite to several cases which are both inapposite and unavailing, as addressed below.

In Cty. of Butler v. Wolf, the plaintiffs challenged the government's reopening plan, which made distinctions between different regions of Pennsylvania. See 2020 WL 5510690. Notably, the Court in Wolf found that the manner in which the government divided businesses into "life sustaining" and "non-life sustaining" classifications, permitting the former to remain open while requiring the latter to close, failed rational basis scrutiny. Id. In U.S. R.R. Retirement Bd. v. Fritz, the "line drawing" referenced by Defendants refers to the task of classifying persons for benefits, a far cry from the case here. See 449 U.S. 166, 179 (1980). In Friends of Animals v. Romero, the plaintiffs challenged the government's adoption of a white-tailed deer management plan. See 948 F.3d 579 (2d Cir. 2020). The "line drawing" referred to there dealt with the government's reliance on information obtained from other areas of the environment rather than studying each distinct area. Id. at 590. This case is therefore inapposite. Finally, in Lederman v. New York City Dept. of Parks and Recreation, the plaintiffs there challenged regulations by parks on sellers of books, art, and similar work, and argued that other individuals were treated more favorably despite the fact those other individuals were not selling anything. See 901 F. Supp. 2d 464 (S.D.N.Y. 2012).

These cases in no way apply here, where the "line drawing" is the heart of Plaintiffs' claims and Plaintiffs submit that the very lines drawn lack any rational basis. Indeed, none of these cases relied on by Defendants deal with the literal "line drawing" by the Defendants in this case. The allegations in the complaint identify comparators that are similar in almost every relevant respect who are treated differently solely based on their physically being situated within Defendants' arbitrary red zones.

16

As explained herein, this approach is consistent with the precedent in the Second Circuit for identifying similarly situated equal protection comparators.  Accordingly, Plaintiffs have sufficiently alleged an equal protection violation under a class-of-one theory.

### c.    Selective Enforcement

To succeed under a selective enforcement theory, a plaintiff must establish that (1) he, "compared with others similarly situated, was selectively treated," and (2) "the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." See Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995) (citation omitted). A plaintiff must identify comparators that "'a reasonably prudent person would think were roughly equivalent'" to the plaintiff, though the plaintiff does not need to show an "exact correlation" between them and that similarly situated person. See AYDM Associates, 205 F. Supp. 3d at 265 (quoting Mosdos Chofetz Chaim, Inc., 815 F. Supp. 2d at 696).

The general rule that equal protection claims are governed by the rational basis test gives way, however, when a law places substantial burdens on core rights.  See U.S. v. Jimenez, 895 F.3d 228 (2d Cir. 2018) (holding that strict scrutiny applies in these cases).   These factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy-a view that those in the burdened class are not as worthy or deserving as others. See City of Cleburne, 473 U.S. at 440.

For these reasons and because such discrimination is unlikely to be soon rectified by legislative means, these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest.  See McLaughlin v. Florida, 379 U.S. 184, 192 (1964); see also Graham v. Richardson, 403 U.S. 365 (1971).

17

Similar oversight by the courts is due when state laws impinge on personal rights protected by the Constitution. See Kramer v. Union Free School District No. 15, 395 U.S. 621 (1969); see also Shapiro v. Thompson, 394 U.S. 618 (1969); Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535 (1942).  Plaintiffs were selectively treated based on their location within the Orthodox community that Defendant Cuomo specifically targeted in addressing the public when implementing EO 202.68.[2]  Defendants did so without any scientific basis or explanation given related to the actual data supporting Defendants' decisions, and EO 202.68 has selectively treated Plaintiffs as compared to Plaintiffs' competitors just mere miles away outside the Orthodox Jewish community and in "orange" or "yellow" zones, or completely outside these zones, who are permitted to operate their sales departments in person according to the Guidance while Plaintiffs were precluded from operating the sales departments in person, and may, in the future, once again be unable to operate their sales departments should EO 202.68 not be struck down.

Indeed, it is now the law of the land that EO 202.68 is unlawful.  See Roman Catholic Diocese, 141 S.Ct. at 67 (holding that the restrictions must satisfy strict scrutiny because they are not neutral and of general applicability, and finding that while stemming the spread of COVID-19 is a compelling interest, it is hard to see how EO 202.68 is narrowly tailored because they are far

---

[2] Before issuing EO 202.68, Governor Cuomo made public statements indicating that the restrictions were motivated in part by concerns about religious gatherings. For example, he noted that the source of the first coronavirus hot spot in New York "was an Orthodox Jewish man who went to a temple" and observed that "Orthodox Jewish gatherings often are very, very large and we've seen what one person can do in a group." The Governor then said that he would be meeting with members of the "ultra-Orthodox [Jewish] community," and if they would "not agree to enforce the rules, then we'll close the institutions down." One day later, he issued EO 202.68. Three days after issuing EO 202.68, the Governor explained that it addresses "a predominantly ultra-orthodox cluster." Five days later, he said the State was "having issues in the Orthodox Jewish community in New York, where because of their religious practices, ... we're seeing a spread." He said that state-level enforcement was necessary because the "ultra-Orthodox communities ... are also very politically powerful." See Agudath Israel of Am. v. Cuomo, 983 F.3d 620, 627 (2d Cir. 2020).

18

more restrictive than any similar regulations before the Supreme Court, *and far more severe than has been <u>shown</u> <u>to</u> <u>be</u> <u>required</u> to prevent the spread of the virus*) (emphasis added); see <u>also</u> <u>Matter of Lasertron, Inc.</u>, 2021 WL 28456 (holding, under Article 78 of the NY CPLR, that the government's actions are arbitrary, capricious, and lack any rational basis, and stating: "Judicial deference has its limits.  Here, considering the record shows full compliance by Lasertron with state-imposed requirements -- to the satisfaction of [the government] - *and <u>no</u> <u>scientific</u> <u>evidence</u> of any coronavirus transmission from its facility* … only goes to prove the Court's concern") (emphasis added)

The Supreme Court thus removed the ten (10) and twenty-five (25) person limit restrictions, permitting houses of worship to operate at limited capacity like every other business. The Plaintiffs here face similar severely restrictive measures in that they were required to close their doors except to those who have made appointments while other dealerships do not have to (and may again be required to do so in the future), despite the fact that all dealerships are required to operate on imposed limitations on the number of people who may be inside the dealership at any given time.

Just like the houses of worship in <u>Roman Catholic Diocese</u> have been granted relief by being permitted to operate at the same capacity limits as any business, the Plaintiffs too should be permitted to operate under the same capacity limits without any further restrictions like dealerships outside the red zone.  Indeed, none of the information made available by Defendants explains the rationale behind the implementation of EO 202.68.  Further, Defendants applied these regulations to the very neighborhood in which the Orthodox Jewish community exists, which Plaintiffs' dealerships are located in, rendering them victims as innocent bystanders to the Defendants' unlawful restrictions.

While Defendants' website provides that the State developed a "science-based approach" to contain "these clusters" and stop any further spread of the virus, including new rules and restrictions directly targeted to areas with the highest concentration of COVID cases and the surrounding communities,[3] Defendants, to date, have not provided the public with the numbers supporting their decision, including any information related to the number of positive COVID cases on the section of Nostrand Avenue where Plaintiffs' dealerships are located.  This is likely because, upon information and belief, the number of positive COVID cases on the Nostrand Avenue blocks where Plaintiffs' dealerships are located does not warrant it being in the red zone.

It should come as no surprise, then, that the Defendants have been hiding the ball with respect to all sorts of information, casting an even greater shadow of doubt over their decisions. For instance, the Empire Center for Public Policy has recently petitioned the Supreme Court of the State of New York, Albany County, to review the government's decisions denying and refusing to provide data concerning COVID-19 related deaths of residents of nursing homes and assisted living facilities.  <u>See</u> Declaration of Jamie S. Felsen, Esq. in Opposition at ¶ 4, Ex. A.  The public has a right to know the information the government relies on in creating these restrictions which inherently affect their lives.  This absence of evidence and refusal to willingly provide same to support Defendants' conducts makes it clear that Plaintiffs were selectively treated based on their location within the Orthodox community that Defendant Cuomo specifically targeted in addressing the public when implementing EO 202.68.  <u>See</u> <u>Roman Catholic Diocese</u>, *supra* (holding that EO 202.68 is unconstitutional as applied to houses of worship).  Plaintiffs are innocent bystanders to Defendants' unlawful conduct.

---

[3] <u>See</u> https://esd.ny.gov/ny-cluster-action-initiative-guidance (last accessed January 21, 2020, last updated December 15, 2020).

Defendants created the red zones without any scientific basis or explanation given related to the actual data supporting Defendants' decisions. Indeed, when challenged here and in other cases, Defendants merely mustered to provide unsupported and conclusory percentages without the underlying figures, i.e., dates of and total number of individuals tested in the red zone and total positive number within the red zone, dates of and total number of individuals tested on the block where Plaintiffs' dealerships are located and the total positive number, as compared to other areas to indicate whether areas outside the red zones actually have a lower infection rate.

Defendants have doubled down on this approach and argue with questionable authority that they are not required to justify their decisions.  This is exactly the type of abuse of power our founding fathers had in mind when granting courts the power to check same.  Indeed, Plaintiffs' dealerships had no positive COVID cases of its employees in the six (6) weeks leading up to the issuance of EO 202.68 and there are no known positive cases[4] of the thousands of customers who have visited Plaintiffs' dealerships throughout the COVID pandemic.[5]  See Docket Entry 6 at 5 ¶ 20.  There is simply no basis whatsoever for the implementation of the red zones where Plaintiffs' dealerships are located.  During the time Plaintiffs were in the red zone, virtually all of Brooklyn was designated yellow, as a "precautionary zone," yet nothing precluded an individual from traveling down the block into an orange or red zone.

---

[4] The Supreme Court considered the fact that the houses of worship similarly had no known cases and strictly complied with the already burdensome restrictions imposed prior to EO 202.68, as this Court should consider Plaintiffs' similar evidence (and Defendants' lack of evidence) here.  See Roman Catholic Diocese, 141 S. Ct. at 66 ("And they tell us without contradiction that they have complied with all public health guidance, have implemented additional precautionary measures, and have operated at 25% or 33% capacity for months without a single outbreak").

[5] It is respectfully submitted that, through the contact tracing being performed by New York, Plaintiffs would have been informed about any customers who tested positive for COVID after visiting Plaintiffs' dealerships.

Moreover, there was no lawful basis for suggesting that the public's health or safety is furthered by shuttering automobile dealerships in a red zone while automobile dealerships located several blocks away in an orange or yellow zone remain open. The entire initiative, which has properly been found to be improper by the Supreme Court already, can in no way be rationally related to prevent the spread or transmission of COVID-19.

It is worthy to note that Defendants concede that their cluster initiative is unlawful as the cluster initiative issued by Defendant Cuomo is no different than the proposal by Defendant de Blasio of zip code designations preceding Cuomo's, which he rejected during a press conference on October 5, 2020, because it contained "arbitrary lines." Incredibly, Defendant Cuomo contradicted himself and issued the arbitrary cluster initiative contained in EO 202.68 which is no different than the zip code designations. On October 6, 2020, Defendant Cuomo addressed the public in a thirty (30) minute press briefing[6] in which he announced the new "cluster action initiative." During that briefing, Defendant Cuomo proclaimed that: (i) we are seeing clusters across the state in Colleges, Binghamton, Orange, Rockland, Queens, Brooklyn, and Nassau; and (ii) clusters seep into the community, which equals community spread. Later in the press briefing, Defendant Cuomo states that the cluster is drawn by actual case numbers, not ZIP codes or census tract. Further in the briefing, Defendant Cuomo provided the following chart:

| Data | 10/5 |
|------|------|
| Top-20 ZIP Codes in hotspots | 5.5% |
| Statewide positivity | 1.20% |
| Statewide positivity with hotspot ZIP codes oversample | 1.45% |
| Statewide deaths | 9 |
| Statewide hospitalizations | 705 |
| Statewide ICU | 158 |
| Statewide intubations | 72 |

---

[6]    See    https://www.governor.ny.gov/news/governor-cuomo-announces-new-cluster-action-initiative (last accessed October 7, 2020).

22

However, Defendant Cuomo <u>never</u> provided or made public the case numbers that provide that the Brooklyn area where Plaintiffs' dealerships operate have additional cases.

This is despite the fact that Defendant Cuomo has consistently made case numbers available on a daily basis for the entire State and, from time to time, for certain parts of the State by county. In that regard, Defendant Cuomo's measly provision of a "top-20 ZIP code" infection rate is not availing and cannot serve as a basis for enforcing EO 202.68 against Plaintiffs; neither is the percentages they have provided concerning the seven-day average positivity rates.

Based on the foregoing, Defendants have evinced an intent to discriminate on the basis of impermissible considerations. Dealerships in "orange" or "yellow" zones, or those outside of the zones, who are a mere couple miles away from Plaintiffs' dealerships, are not subject to Defendants' enforcement while Plaintiffs' dealerships were (and are in the future), and the Defendants have not even provided the public with any data supporting the factual basis for their creation of the zones.

Further, the United States Supreme Court has found that EO 202.68 violates the First Amendment. To the extent that the Defendants' intent was discriminatory towards religion, Plaintiffs are innocent bystanders to the Defendants' impermissible conduct of inappropriately restricting the religious rights of its citizens which the Supreme Court found was unconstitutional.

According to Dr. Zucker's declaration, positive cases decreased 1% per week each week in the three (3) weeks prior to the implementation of EO 202.68. As a result, there was no basis to implement the additional restrictions challenged here when the positivity rates had been decreasing on their own and implementing EO 202.68 would not help.

Perhaps an even more glaring fact is that Governor Cuomo subsequently stated that though New Jersey, Connecticut, and Pennsylvania have positivity rates that require them to be on the mandatory quarantine list, he made an exception because it will destroy the economy.[7]  Effectively, what this means is that Governor Cuomo is permitting businesses and people outside of New York with positivity rates higher than the red zone to come into New York while he is prohibiting Plaintiffs from running their New York businesses. There is no greater hypocrisy in these incontrovertibly contradictory positions, and Plaintiffs respectfully submit that the mandates under EO 202.68 are thus arbitrary because there is no rational basis for restricting Plaintiffs' businesses while allowing those from outside the State of New York with higher positivity rates to travel in and out of the state.

In support of their motion, Defendants cite to several cases, all of which are inapposite and unavailing.

In Lilakos, where homeowners brought an action against the government alleging that they violated their equal protection and due process rights when its buildings department issued notices of violation and an emergency vacate order against their home for operating an illegal hostel in a permanent residence, the Second Circuit held that the plaintiffs there failed to explain *how* other residences were like theirs, other than alleged transient occupancy.  This case is, therefore, inapposite, as there is no distinguishing feature between dealerships in the red zone, like Plaintiffs, and those outside of it.

Hampshire Recreation was previously distinguished in these papers.  See *supra* at 14.

---

[7]  See  https://newyork.cbslocal.com/2020/10/20/tri-state-area-travel-advisory-coronavirus-covid-19-new-jersey-connecticut-new-york/  (last accessed January 22, 2021); https://www.youtube.com/watch?v=EFHUvtFY7fY&feature=emb_title  (last accessed January 22, 2021).

In Lebanon Valley, Judge Lawrence E. Kahn of the Northern District of New York held that the plaintiffs failed to allege any facts suggesting some racetracks were not subject to enforcement, and that the protestors and rioters to whom the plaintiffs compared themselves did not have the requisite equivalence to state a claim for relief.  This is not the case here, where Plaintiffs sufficiently allege that dealerships outside the red zone are their comparators and that, as set forth above, Defendants selectively enforced EO 202.68 against them based on impermissible reasons.  Indeed, the Plaintiffs in this case did not compare themselves to protestors and rioters, and they have – in fact – compared themselves to other dealerships, which the plaintiffs in Lebanon Valley failed to do by comparing themselves to other racetracks.

As such, Plaintiffs have sufficiently alleged an equal protection violation under a selective enforcement theory.

### ii.      Commerce Clause of Article 1, § 8 to the United States Constitution

Defendants argue that the Plaintiffs' commerce clause claims must be dismissed because (1) the EO does not discriminate between out-of-state and in-state commerce; (2) it does not impose a burden on interstate commerce that is "qualitatively or quantitatively different from that imposed on intrastate commerce;" and (3) the benefits of controlling a pandemic that has killed many thousands of New Yorkers far outweigh the limited, temporary restrictions on in-person auto sales in red zones.

A law violates the dormant Commerce Clause if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits."  See Pike v. Bruce Church, 397 U.S. 137, 142 (1970); see also Tolchin v. Supreme Court of the State of New Jersey, 111 F.3d 1099, 1108 (1997).

The Commerce Clause protects against inconsistent legislation arising from the projection of one state's regulatory regime into the jurisdiction of another state.  See Healy v. Beer Inst., Inc., 491 U.S. 324, 337 (1989); see also CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 88-89 (1987).  Likewise, and similarly, states are prohibited from enforcing laws that control commerce occurring wholly outside their boundaries.  See Healy, 491 U.S. at 336.

Here, Plaintiffs have alleged that the purported putative local benefit to the Defendants' promulgation of EO 202.68 does not outweigh the massive burden imposed on interstate commerce by refusing to permit Plaintiffs' dealerships from conducting sales in-person rather than only remotely.  First, Defendant Cuomo has stated numerous times that the States of New York, New Jersey, and Connecticut must unite to the extent possible in making rules to prevent the transmission of COVID-19 because, without same, citizens will simply travel to nearby states in order to do activities they are forbidden from doing in their home state.

Now, in an apparent about-face, Defendants have thrown that wisdom to the wind in localizing selective enforcement of certain neighborhoods of certain counties based on unpublished and otherwise hidden data and arbitrarily crayoned lines on a map.

Further, Defendants' implementation of EO 202.68 burdens interstate commerce because individuals are likely to visit dealerships outside the red zone a mere mile away in order to physically see a vehicle in person and purchase it rather than be relegated to conducting a sale remotely as Plaintiffs are required to based on the arbitrary red zone they are placed in.

In addition, EO 202.68 violates the Commerce Clause because it effectively forbids Plaintiffs from meeting clients and vendors located in states other than New York, such as in New Jersey. Similarly, Defendants have also regulated commerce in other states by prohibiting out-of-state individuals and businesses from engaging in business with Plaintiff by being able to walk in.

26

Therefore, EO 202.68 discriminates against interstate commerce, while favoring intrastate commerce by mandating that Plaintiffs only conduct business inside of New York by requiring appointments be made in advance, thus requiring Plaintiffs to turn away walk-in customers from outside of the state should they fail to make an appointment.

In support of their motion, Defendants rely on case law which they either misconstrue or is otherwise inapposite.

In Pike v. Bruce Church, Inc., a grower of cantaloupes filed suit against the government to enjoin an order prohibiting it from transporting uncrated cantaloupes from its Arizona ranch to a nearby California city for packing and processing as unconstitutional. See 397 U.S. 137 (1970). The Supreme Court held that the order, which would compel the grower to build packing facilities in Arizona that would cost approximately $200,000, constituted an unlawful burden upon interstate commerce. Id. The same result is compelled here, where the Plaintiffs stand to lose hundreds of thousands of dollars from out-of-state customers who would travel to their dealerships only to be turned away by an arbitrary appointment requirement, and the burden is inherently unequal because out-of-state customers have to travel greater distances to reach the dealerships.

Defendants cite to Healy v. Beer Inst. for the proposition that, to state a claim under the Commerce Clause, the critical inquiry is whether the *practical effect* of the regulation is to control conduct beyond the boundaries of the state, and that EO 202.68 pertains only to geographical areas located entirely within New York State. See 491 U.S. 324 (1989). However, this myopic view ignores the practical effect of EO 202.68 – that out-of-state customers who travel to Plaintiffs' dealerships without an appointment must be turned away. In that vein, Defendants' argument that EO 202.68 places no greater restrictions on interstate commerce as it does on intrastate commerce ignores this fact.

27

Similarly, for the same reasons, EO 202.68 necessarily incidentally burdens interstate commerce because it regulates beyond the State's borders.

Accordingly, Plaintiffs have sufficiently alleged a claim that EO 202.68 as applied violates the Commerce Clause of the United States Constitution.

### iii.     Contracts Clause of Article I, § 10 to the United States Constitution

Defendants argue that the Plaintiffs' contracts clause claims must be dismissed because (1) the EO does not impose a burden on any existing contract, much less a substantial burden, and (2) even if the EO had substantially impaired Plaintiffs' existing contracts, which it did not, it serves a "significant and legitimate public purpose," and "the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption."

The Contracts Clause provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." See U.S. Const. Art. I, § 10, cl. 1. Here, EO 202.68 impairs the ability of Plaintiffs to fulfill their agreements with various vehicle manufacturers to market and sell their vehicles.  See Docket Entry 27 at ¶ 4, Ex. A (copies of redacted existing contracts between Plaintiffs and vehicle manufacturers imposing obligation on Plaintiffs to sell vehicles). Plaintiffs are prepared to amend their pleadings should this Court deem it necessary, but respectfully submit that they have already submitted evidence in the record to show the existence of these agreements and their requirements.  Id.  EO 202.68 substantially impairs those contractual relationships because, as set forth in the pleadings, Plaintiffs are forced into noncompliance with the terms of their agreements by being forced to turn walk-in customers away.

Further, EO 202.68 does not constitute a "reasonable means to a legitimate public purpose" because less restrictive means are available to achieve the Defendants' purported objective of preventing the transmission of COVID-19 by permitting Plaintiffs' dealerships to continue operating with an in-person workforce pursuant to the guidelines, which the Defendants have deemed to be sufficient to achieve that objective.  See Assoc. of Surrogates & Supreme Court Reporters Within City of New York v. State of New York, 940 F.2d 766, 771 (2d Cir. 1991) (internal quotation marks and citations omitted).

Defendants rely on various cases which are unavailing and inapposite, such as Omnistone Corp. v. Cuomo, for the proposition that it is difficult to imagine how EO 202.6 and 202.8 – which required all businesses to close regardless of geographic location, and is not the executive Order challenged here – could arguably not serve a legitimate purpose in the midst of a catastrophic global pandemic of a kind not seen for more than a century.  See 2020 WL 8172761.  Defendants' reliance on Omnistone is misplaced for several reasons.  First, it involves other executive orders which required all businesses to be similarly restricted.  Second, that decision was made two (2) months into the pandemic when the world at large was uncertain as to how the pandemic would play out.  Third, it predates the United States Supreme Court's decision in Roman Catholic Diocese.

Defendants also rely on Luke's Catering Serv., LLC, Geller, McCarthy, and Murray – all of which predate and otherwise do not concern EO 202.68 – for the proposition that preventing the spread or transmission of COVID-19 is a compelling state interest.  However, as set forth in Plaintiffs' motion for a temporary restraining order and preliminary injunction, as well as herein, the regulations under EO 202.68 have no rational basis to that interest.

Further restricting some businesses while not doing so for others is akin to plugging only one leak along a pipe filled with holes.  While neither party suggests that a complete, total, and indefinite shutdown with a shelter-in-place mandate is in order despite the fact that doing so would be effective in preventing the spread and transmission of COVID-19, Defendants respectfully submit that the ridiculous and unsupportable nature of taking such a measure bears a striking resemblance to the measures undertaken by EO 202.68.  Accordingly, Plaintiffs have sufficiently alleged a claim that EO 202.68, as applied, violates the Contracts Clause.

### iv.    <u>Ninth & Tenth Amendments to the United States Constitution</u>

Defendants argue that Plaintiffs' Ninth and Tenth Amendment claims should be dismissed because: (i) the Ninth Amendment does not provide a private right of action to litigants; (ii) the Ninth Amendment has not been incorporated into the Fourteenth Amendment; (iii) the Tenth Amendment is simply a declaration of the relationship between the national and state governments; and (iv) because Plaintiffs did not bring suit against federal actors, it failed to properly allege a violation of the Tenth Amendment. The Ninth Amendment to the United States Constitution establishes that the enumeration in the Constitution of specific rights shall not be construed in order to deny or disparage the rights retained by the American people.  <u>See</u> U.S. Const. amend. IX (emphasis added).  Relatedly, the Tenth Amendment to the United States Constitution establishes that that the powers not delegated to the States by the Unites States Constitution, nor prohibited by the United States Constitution to the States, are reserved to the States respectively, or to the American people.  <u>See</u> U.S. Const. amend. X (emphasis added).

Here, when the Ninth and Tenth Amendments are read together and considered in the context of Plaintiffs' Amended Complaint, despite Defendants' assertions, Plaintiffs have stated a valid claim for the violation of its Ninth and Tenth Amendment rights.

The Tenth Amendment is often interpreted and addressed in the manner which Defendants would now have this Court address Plaintiffs' claims – by suggesting that the Tenth Amendment does not protect personal rights, and that "only the Federal government, by asserting a power not surrendered by the States or the people, can be alleged to have violated the Tenth Amendment." See Warren v. US., 859 F. Supp. 2d 522, 543 (W.D.N.Y. 2012)).

However, Defendants conveniently omit what is perhaps the most significant portion of the Tenth Amendment: the reservation of rights "to the American people." See U.S. Const. amend. X. A plain reading of the Tenth Amendment shows that, rather than being singularly focused upon the potential actions of the federal government, it was the intention of the Framers that when certain powers are neither not delegated to the States by the United States Constitution, nor prohibited to the States by the United States Constitution, and those same rights are not expressly otherwise provided to the States, the same powers (and rights) are reserved to the American people.

This is so because, without such a limitation on the rights of States, States would effectively maintain any and all powers not otherwise reserved for the Federal Government, which would leave the States in a position of such power that even Defendants surely would not claim exists. Moreover, the Ninth Amendment, when read in conjunction with the Tenth Amendment and used as a "rule of construction," as Defendants suggest, adds an additional layer of protection to those rights. Notwithstanding Defendants' assertions to the contrary, the Ninth Amendment to the United States Constitution does not limit the protection it affords the "American people" to protection against actions taken by federal officials; rather, the Ninth Amendment contains broadly that the Constitution "shall not be construed [so as to] deny or disparage the rights retained by the American people. See U.S. Const. amend. IX.

Thus, Plaintiffs' claim that Defendants violated Plaintiffs' Ninth and Tenth Amendment rights, although pleaded as against State actors, is valid, as the protections afforded thereby are not limited to intrusions by State actors. Because Plaintiffs have asserted many violations of the individual rights which they retain under the United States and New York Constitutions, Defendants' Motion to Dismiss this portion of Plaintiffs' Amended Complaint must be denied.

<strong>v.  Violations under the Constitution of the State of New York</strong>

Defendants assert that sovereign immunity under the Eleventh Amendment to the U.S. Constitution bars suits in federal court which names states and/or state officials in their official capacities unless Congress has abrogated that State's Eleventh Amendment immunity, or the State has waived such immunity by unambiguously consenting to the suit.

However, an exception to Eleventh Amendment sovereign immunity applies under *Ex Parte* Young, 209 U.S. 123 (1908). In determining whether *Ex Parte* Young voids the Eleventh Amendment bar, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law, and seeks relief properly characterized as prospective. See CSX Transp., Inc. v. N.Y. State Office of Real Prop. Servs., 306 F.3d 87, 98 (2d Cir. 2002) (citing Verizon Md. Inc. v. PSC, 535 U.S. 635, 642 (2002)). The Supreme Court has emphasized that the purpose of *Ex Parte* Young is to "ensure that the doctrine of sovereign immunity remains meaningful, while also giving recognition to the need to prevent violations of federal law." Id. (citing Idaho v. Coeur D'Alene Tribe, 521 U.S. 261, 269 (1997).

Thus, "a limited exception to the general principle of sovereign immunity allows a suit for injunctive relief challenging the constitutionality of a state official's action in enforcing state law under the theory that such a suit is not 'one against the State[,]' and therefore not barred by the Eleventh Amendment." Id. (citing *Ex Parte* Young, 209 U.S. at 154).

In order for the *Ex Parte* Young exception to sovereign immunity to apply, the State official against whom relief is sought must have "both a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." See Citizens Union of the State of New York v. Attorney General of the State of New York, 2017 U.S. Dist. LEXIS 97514, at *4 (S.D.N.Y. June 23, 2017). "[I]t is plain that such office must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the [S]tate, and thereby attempting to make the [S]tate a party." See *Ex Parte* Young, 209 U.S. at 157.

Here, all the Defendants have some connection with the enforcement of EO 202.68, which Plaintiffs submit falls within the limited exception under *Ex Parte* Young.   See Aldridge v. Lamont, No. 3:20-CV-00924 (KAD), 2020 WL 7773415, at *5 (D. Conn. Dec. 30, 2020) (applying *Ex Parte* Young doctrine to permit state law claim as exception to Eleventh Amendment immunity due to allegations of ongoing violations of federal law.

**B.  Plaintiffs State a Claim Against the City.**

The City argues that Plaintiffs have not alleged any wrongdoing by the City.  However, the State has directed the City to enforce EO 202.68.  See "Failure by Local Governments to Adhere to Order and Enforce Public Health Regulations Can Result in Penalties of up to $10,000 per Day" at  https://www.governor.ny.gov/news/governor-cuomo-directs-doh-commissioner-issue-section-16-order-covid-19-hot-spot-local  (last  visited  January  21,  2021); see  also https://newyork.cbslocal.com/2020/10/03/nyc-covid-19-cluster-enforcement/  (Gov.  Cuomo Warns NYC Leaders to Step Up Mask and Social Distancing Enforcement, Could Hit City With $10,000 Fine, reporting the that governor said he's going to enforce Section 16 of the health law, which will allow him to fine the city $10,000 for violations) (last visited January 21, 2021).

Defendant Cuomo specifically stated "[i]f the local governments don't step up the compliance, they will actually be in violation of the law and they can be fined." Id.  In that regard, the City is both a proper and necessary defendant in this case because Plaintiffs cannot be afforded complete relief if the City is not enjoined from enforcing EO 202.68 as it is being called upon by the State to do.  See Fed. R. Civ. P. 19 (a party is necessary if, in that person's absence, the court cannot accord complete relief among existing parties).  For that reason alone, the City's motion to dismiss on this ground must be denied.

**C.  Alternatively, Plaintiffs Must be Granted Leave to Amend the Complaint**

The Second Circuit has stated that "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." See Hayden v. Cnty. of Nassau, 180 F.3d 42, 53 (2d Cir. 1999); see also FED. R. CIV. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  Here, in the event Plaintiffs' claims are dismissed (which they should not be), Plaintiffs respectfully request leave to amend the complaint.

<u>CONCLUSION</u>

For the reasons set forth herein, Plaintiffs respectfully submit that Defendants' motion must be denied.

Dated: Lake Success, New York
     January 22, 2021

**MILMAN LABUDA LAW GROUP PLLC**
       /s/
Jamie S. Felsen, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY  11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
jamiefelsen@mllaborlaw.com
emanuel@mllaborlaw.com

*Attorneys for Plaintiffs*

34